Milhau *v.* Sharp.

————————•◦•————————

JOHN MILHAU and others *vs.* JACOB SHARP and others.

15   193
89a 256
15b 193
13ap289
15b 193
160a 389

According to the ancient rule of the common law, which has always been adopted in this state, the public have no other right in a highway, in the country, than that of passage and repassage; and any interference with the soil, other than such as may be regarded as necessary to the enjoyment of this right, will be considered as a trespass, and an action will lie in favor of the owner of the fee. But there is a wide difference between a highway in the country, and a street in a populous commercial city. *Per* EDWARDS, P. J.

Whether the corporation of New-York be the owner of the fee of the streets in trust for the public, or whether it·be merely the trustee of the streets and highways as such, irrespective of any title to the soil, it has the power to authorize their appropriation to all such uses as are conducive to the public good and do not interfere with their complete and unrestricted use as highways; and in doing so, it is not obliged to confine itself to such uses as have already been permitted. As civilization advances, new uses may be found expedient. *Per* EDWARDS, P. J.

A railway in a city is not *per se* a nuisance, or a purpresture.

The corporation of the city of New-York has the power and right to authorize the use of its streets for a railway.

So far as the common council of the city of New-York acts in the exercise of its public political powers, and within the limits of its charter, it is vested with the largest discretion. And whether its laws are wise or unwise; whether they are passed from good or bad motives, it is not the province of the supreme court to inquire. But as regards the acts of the corporation in reference to its private property, it stands upon a very different footing.

Such property is held for the common benefit of all the corporators. In respect to that, the corporation is charged with high duties. It is the depositary of a trust, which it is bound to administer faithfully, honestly and justly. And if it is guilty of a breach of trust, by disposing of its valuable property without any or for a nominal consideration, it will stand upon the same footing as if it were the representative of a private individual, or of a private corporation.

The mere fact that the forms of legislation are used, in committing such breach of trust, will make no difference in the character of the act. It will not be in any sense the exercise of a political power delegated for public purposes. And the privilege of exemption from judicial interference terminates where legislative action ends.

When a public corporation acts in reference to its private property, its acts are equally of a private character, and equally subject to judicial control, with those of a private corporation.

The streets, in the city of New-York, are a species of *property*, held by the corporation, and are subject to the same trusts and duties as is its other property.

Where the common council of the city of New-York granted to the defendants permission and authority to lay a double railway track in Broadway, upon terms less advantagous to the city than had been offered by other persons; *Held,* that the corporation, in making such grant, was guilty of a clear breach of trust, and that the court was bound to prevent the grant thus illegally made, from being carried into effect. MORRIS, J. dissenting.

*Held also*, that persons who were owners of property in the city, and tax payers to a large amount, had such an interest in preventing the grant from being carried into effect that they had a right to institute a suit in their own names, for the purpose of obtaining an injunction to prevent the construction of the railway track. MORRIS, J. dissenting.

Under the 4th section of the act of April 2, 1849, relative to the city of New-York, which provides that neither board of the common council shall adjourn for a longer period than three days, except by a resolution to be concurred in by the other body, the board of aldermen had the power, without the concurrence of the other board, to adjourn from the 4th to the 8th of November; the 7th being Sunday, which is not a proper day for the performance of secular business, and is therefore not to be counted. *Per* S. B. STRONG, J.

No court has power to issue an injunction to restrain the legislative action of a municipal corporation. And a common council, in granting to individuals permission to lay a railway track in one of the streets of a city, in defiance of an injunction forbidding the making of such grant, will not be guilty of a criminal contempt. Nor will the grant be void because thus made. *Per* S. B. STRONG, J. and MORRIS, J.

If a grant of the privilege of constructing a railway in one of the streets of a city is void, from the want of authority in the common council to make

Milhau *v.* Sharp.

It, or is invalid from any cause, the proprietors of lots and buildings on the street in question are the proper parties to apply for an injunction to prevent the carrying of the grant into effect. *Per* S. B. STRONG, J.

The common council of the city of New-York has no authority, under the city charter, or any statute, to give away, or make an improvident grant of, the public property; nor is any such power essential to the performance of any of its legitimate duties. Its disposition of such property, including franchises, is therefore subject to the common law principles applicable to grants made by trustees to whom the management of private property is confided. *Per* S. B. STRONG, J.

THIS was an application by the plaintiffs for a perpetual injunction, to restrain the defendants and their associates from constructing a railway in the street called Broadway, in the city of New-York. The facts upon which the application was founded are sufficiently set forth in the opinions delivered by different members of the court.

*G. C. Bronson* and *John Van Buren*, for the plaintiffs. I. The adjournment of the board of aldermen from the fourth to the eighth of November, being more than three days, put an end to that monthly session of the board; and when the board subsequently met, in pursuance of the adjournment, it was not a legal assembly, and could do no valid act. (*Charter of 1849*, §§ 4, 6. *Ex parte Dodge*, 7 *Cowen*, 147. *Story* v. *Elliot*, 8 *Id.* 27. *Beynton* v. *Page*, 13 *Wend.* 425. *Sayles* v. *Smith*, 12 *Id.* 57. *Broome* v. *Wellington*, 1 *Sandf. S. C.* 666. *Swan* v. *Broome*, 1 *W. Black.* 496, 499. 3 *Burr.* 1595, *S. C.*)

II. Making the grant in defiance of the injunction, was an illegal and criminal act, which could confer no right on the grantees. (2 *R. S.* 534, §§ 1, 26. *Id.* 278, §§ 10, 15. *Spalding* v. *The People*, 7 *Hill*, 301, 302. *Davis & Palmer* v. *The Mayor of New-York*, *Superior Court, Feb.* 5. 1853.)

III. The corporation has no power to establish or authorize a railroad in Broadway. 1. The fee of the land, in the site of the street, is in the owners of real property on each side *ad medium filum viæ*, subject only to the easement or right of way, as it now exists. (*John and Cherry streets*, 19 *Wend.* 659, 675. *Gidney* v. *Earl*, 12 *Id.* 98. *Cortelyou* v. *Van Brundt*, 2 *John.*

357. *Jackson* v. *Hathaway*, 15 *Id.* 447. *Chester* v. *Alker*, 1 *Burr.* 133, 145. 1 *Day*, 103. *Livingston* v. *Mayor of New-York*, 8 *Wend.* 85, 107. *Adams* v. *Saratoga and Washington Railroad*, 11 *Barb.* 414, 452. *Lade* v. *Shepherd*, 2 *Strange*, 1004. *Barclay* v. *Howell*, 6 *Peters*, 498. *Wyman* v. *Mayor of New-York*, 11 *Wend.* 487, 502. *Perly* v. *Chandler*, 6 *Mass.* 453. *Whitbeck* v. *Cook*, 15 *John.* 483. *Trustees Presbyterian Church* v. *Auburn and Rochester Railroad*, 3 *Hill*, · 567. *Hammond* v. *McLachlan*, 1 *Sandf. S. C. R.* 323. *Herring* v. *Fisher*, *Id.* 344. 3 *Kent*, 433. 4 *Smith's Lead. Cas.* 90, *Am. note.*) As the law presumes the fee to be in the land owners, on each side of the street, *usque ad filum viæ*, those who allege that the fee is elsewhere must prove the fact. The corporation must produce its title, if it have any. 2. Having nothing but an easement, or right of way, the corporation has no right to dig in the soil for the purpose of laying rails and constructing a railroad in the street, nor can it grant any such right to others. 3. Digging in the soil, laying rails, and constructing a railroad in the street, is appropriating the property to a new use, and one which is exclusive in its nature. 4. The right of eminent domain is in the state ; and the power to exercise the right for the purpose of establishing a railroad in Broadway has not been delegated to the corporation of the city of New-York, nor to any one else. 5. The land in the site of the street cannot be taken for the purpose of establishing a railroad, without making just compensation to the owners of the soil. (*Const. art.* 1, § 6. *Trustees Presb. Soc.* v. *Auburn and Rochester Railroad*, 3 *Hill*, 567. *Fletcher* v. *Auburn and Syracuse Railroad*, 25 *Wend.* 462.) 6. Constructing a railroad in the street, would be an injury to the plaintiffs and other land owners, because they never dedicated the property to such a purpose, and because the property on each side of the street would be depreciated in value.

IV. All citizens and travelers have a right to the free and common use of the carriage way of the street, and every part of it, with their carts and carriages ; and the corporation has no power to grant to others any particular or exclusive use of the

Milhau v. Sharp.

street, or any part of it; or to allow its grantees to use the street in a way which is not alike common to all.

V. The resolution in question is not a law, but a contract; and the common council, without the mayor, has no authority by law to make contracts. 1. The common council itself calls it a grant, which is one kind of contract; and the grantees say the same thing. 2. But whatever they may now find it expedient to say, it was not a command, but a proposal for a bargain; and when accepted, it did not make a law, but a contract. 3. Contracts can only be made by the whole corporation, or the proper executive department; and not by the two boards without the mayor.

VI. Whether the resolution be called a contract or a law, it professes to grant to Sharp and others, property or privileges belonging to the city; and such a grant cannot be made by the two boards without the concurrence of the mayor as an integral part of the corporation. 1. All rights of property and all privileges belonging to the city, are vested in *the whole* corporation; and can, of course, only be alienated by the act of the whole. As the two boards constitute but a *part* of the corporation, they cannot make the grant. 2. The common council has no powers except such as have been specially delegated to it; and the power to dispose of the property or privileges of the city, has not been delegated to that body. 3. The attempt of the two boards to make the alienation, without the concurrence of the mayor, was a plain usurpation of authority, and could confer no rights upon the grantees.

VII. If the resolution is to be regarded as a by-law, instead of a contract, it is still void for several reasons. 1. The power to establish or authorize a railroad in the street has not been delegated to the common council. 2. The power could not be exercised, by the state itself, without making just compensation to the owners of the property taken for the railroad. (*Const. art.* 1, § 6.) 3. The common council has attempted, either to usurp the authority of the mayor, to license carriages, or to compel him to give licenses against his will. 4. It has attempted to create a corporate franchise. 5. It has attempted to confer

on Sharp and others an exclusive privilege in one of the public streets.   6. It has attempted to create an odious monopoly of perpetual duration.   7. The by-law is unreasonable, because it has been made upon terms highly injurious to the city, and to all citizens, tax payers, and travelers.   (*Com. Dig. By-laws.*)

VIII. This railroad would be a nuisance, specially injurious to the plaintiffs and others, not only while the road was in the process of construction, but after it should be completed.   It would injure the plaintiffs and other property owners, by diverting a portion of the business now done on the street into other channels; and the plaintiffs and other citizens, and travelers would be injured in respect to the present common right of passage with their carts and carriages.   (*Brower* v. *Mayor of New-York,* 3 *Barb. S. C. R.* 254.)

IX. If the corporation had power to grant the privilege of establishing a railroad, it should have adopted the proper regulations concerning the mode of constructing and using the work, and then have left the executive duty of obtaining the best terms, and entering into the necessary contract, to the head of the proper department.   (*Christopher* v. *Mayor of New-York,* 13 *Barb.* 567.)

X. Whatever interest in or power over the street rightfully belongs to the corporation, it holds the same as a trust, to be exercised for the public good; and the grant of these privileges for a trifling sum, with the right to demand five cents fare from travelers, when the trustees might have obtained a million of dollars for the grant, with a charge upon travelers of only three cents, was a palpable breach of trust and a gross fraud upon the plaintiffs, and all other tax payers, inhabitants, and travelers in the city.   (*Christopher* v. *Mayor of New-York,* 13 *Barb.* 567. *Davis & Palmer* v. *Mayor of New-York, decided by superior court, February* 5, 1853.   *Agar* v. *Regent's Canal Company, Cooper's Eq. Cases,* 77.   *Lawrence* v. *Mayor of New-York,* 2 *Barb. S. C. R.* 577.)

XI. If we are right in all or any of the foregoing positions it is very clear that the injunction should be continued.   (*Attorney General* v. *Aspinwall,* 2 *Myl. & Cr.* 613.   *Attorney*

Milhau *v.* Sharp.

*General* v. *Corporation of Pool,* 4 *Id.* 17.    *Attorney General* v
*Dublin,* 1 *Bligh's N. R.* 312.  *River Dun* v. *N. Midland Rail-*
*road Company,* 1 *Railway Ca.* 154, 5.   *Frewin* v. *Lewis,* 4
*Myl. & Co.* 255.  *Corning* v. *Lowerre,* 6 *John. Ch.* 439.  *Gard-*
*ner* v. *Trustees of Newburg,* 2 *Id.* 162.   *Varick* v. *Mayor of*
*New-York,* 4 *Id.* 53.   *Livingston* v. *Livingston,* 6 *Id.* 497.
*Oakley* v. *Trustees of Williamsburgh,* 6 *Paige,* 262.   *Petit*
v. *Shepherd,* 5 *Id.* 493.   *Bromley* v. *Smith,* 1 *Simon's Ch.*
*Cas.* 8.  *Lawrence* v. *Mayor of New York,* 2 *Barb. S. C. R.* 577.
*Eden on Injunctions, Waterman,* 259, 267, *and notes.   Brower*
v. *Mayor of New-York,* 3 *Barb. S. C. R.* 254.  *Roberts* v. *An-*
*derson,* 2 *John. Ch.* 202, 204.)

*S. Jones* and *D. D. Field,* for the defendants.   I. The cor-
poration of the city of New-York has the power, under the
charter and subsequent statutes, to allow a railway to be laid
in Broadway.   It has long exercised as extensive a power in
dividing the street into side-walk and carriage-way, and laying
pipes beneath.   And it has also exercised a similar power in
the cases of the Harlem, Hudson river, 2d, 3d, 6th and 8th
avenue railways.   (1.) The corporation has the power, inde-
pendent of its ownership of the street.   (*Dongan's charter,* § 2.
*Kent's notes, B., p.* 108.   *Montgomery charter,* § 16.   *Kent's*
*notes, H. H., p.* 142.   *Act of* 1813, §§ 272, 278, 288.   *Act of*
*July* 21, 1824.   *Drake* v. *Hudson River Railroad Co.,* 7
*Barb.* 508.   *Plant* v. *L. I. Railroad Co.,* 10 *Id.* 26.   *Chap-*
*man* v. *Albany and Schenectady Railroad Co., Id.* 360.
*Adams* v. *Saratoga and Wash. Railroad Co.,* 11 *Id.* 444.
*Lex. and O. Railroad* v. *Applegate,* 8 *Dana,* 289.)   2. The
corporation is owner of the street in fee.   See Mr. Hoffman's
letter, and the documents and authorities therein referred to.

II. The corporation having the power, it was lawfully exer-
cised, in the grant by the common council to the defendants in this
case, " of permission and authority" to lay the railway.  1. The
power is to be exercised by the common council, and the notion
that the consent of the may or is indispensable to its exercise, is
without the least foundation.   (*Montgomery charter,* §§ 14, 16.

*Amended charter of* 1830, §§ 1, 12, 13. *Amendments of* 1849, §§ 1, 6.) 2. The common council was legally assembled, when the resolution was passed. The adjournment from Thursday, the 4th November, to Monday, the 8th, did not render the sitting of the 19th invalid. The meaning of the provision, that neither board shall, without the consent of the other, adjourn for a longer period than three days, is, that it shall not stand or continue adjourned for a longer time. If the provision had been, that it should not adjourn for more than *one* day, it might have adjourned from *Saturday* to Monday; *two* days, from *Friday* to Monday; and *three* days make from *Thursday* to Monday. Under our state constitution, which forbids an adjournment for more than two days, each house is in the constant practice of adjourning from Friday to Monday; and under the federal constitution, which forbids an adjournment for more than three days, each house adjourns at pleasure, without communicating with the other, from Thursday to Monday. (*See Cong. Globe of* 1845, *pp.* 23, 752; 1846, *pp.* 28, 87. *Senate Journal of N. Y. for* 1852, *pp.* 35, 201.) 3. The injunction out of the superior court, directed to the corporation, did not suspend the power of the common council, nor affect the validity of the resolution. The injunction was void for want of jurisdiction. And although that court might consider it "highly immoral" to question its jurisdiction, we not only question it, but insist that there is not a respectable authority to support it. If the injunction was valid, and forbade the passage of the resolution, the only consequence of its violation, is punishment for contempt. It did not affect the validity of the resolution. (*Eng. Com. Law Pro. Act,* 1852, § 226. *Foreman* v. *Jeyes,* 5 *B. & Ad.* 835. 14 *Penn.* 67.) 4. The idea, that the agency of the street department was in some way necessary to the validity of the resolution, is unsupported by the law. This is not the case of a contract within the meaning of the 23d section of the amended charter. The "contracts" there referred to, are those entered into for work to be done for the corporation. The resolution in this case was a *legislative* act. To hold otherwise, is to hold that acts of congress or state legislatures granting special priv-

Milhau *v.* Sharp.

ileges to persons named therein, are not acts of legislation. We have a list of 160 resolutions of the common council since the amended charter, under which immense amounts of property are held, all of which are void, if this resolution be so. A *legislative* act is one which establishes a new rule, or a new privilege. An *executive* act is one which executes a legislative or judicial act. This was an act of special legislation, like the granting, by the legislature, of an act of incorporation or other franchise.

III. The corporation having the power, and the common council having lawfully exercised it, this court has no jurisdiction, to inquire into the motives of the members, or the alleged abuse of the power. 1. The common council exercises a portion of the legislative power of the government; and it is a characteristic of our political system, and a maxim of our policy, to encourage and extend local legislation. (*Cons. art.* 3, § 17. *Coates* v. *Mayor of N. York*, 7 *Cowen*, 585. *Britton* v. *Corporation, Mss. Op. Charter of* 1830, § 1. *Amended charter of* 1849, §§ 1, 2, 3, 6.) 2. The motives for the exercise of a legislative or political power, cannot be drawn in question in a court of justice. (*Fletcher* v. *Peck*, 6 *Cranch*, 87. *Bushwick T. Co.* v. *Ebbets*, 3 *Edw.* 353.) 3. Whenever a discretion is vested in a public officer or body, that discretion, whether it be legislative or otherwise, is not subject to the control of the courts. (*Story's Eq. Jur.* 955, *A. Frewin* v. *Lewis*, 4 *My. & Cr.* 254. *Ellis* v. *Earl Grey*, 6 *Sim.* 214. *King* v. *Lords Comrs. of Treasury*, 5 *N. & M.* 589. *Decatur's case.*)

IV. There is, however, no evidence to impeach the motives of the common council in respect to this grant. The defendants' counsel are not here to palliate abuse of power, or defend misgovernment; but they insist that misconduct should be first proved, and then punished. To dispense with evidence and try a cause by clamor, or presumed public opinion, would be as dangerous to the citizen as it would be shocking to the sense of justice, and abhorrent to all our notions of well regulated government. In the present case, every defendant denies, under oath, any participation in, or knowledge of, improper motives in

Milhau *v.* Sharp.

making the grant. If oaths of members of the common council are not offered to the same effect, it is because too much regard was had to their self-respect to ask them to make an affidavit that they had not been guilty of a heinous offense, just as it would have been thought indelicate to ask a judge whose motives had been assailed to make an affidavit that he had judged according to his conscience. There is no direct and specific charge of corruption in this case, but if it has existed, let it be charged and proved; the mode of making the charge, and the means of proof, are open to all. Till then this cause must be decided precisely as if every body in New-York, other than the plaintiffs, believed in the utility of the railway and the propriety of the grant to the defendants. And if it be not so decided, the decision will be founded on something out of the case; which it is but decent to presume impossible.

V. There was, moreover, no abuse of power. 1. Every precaution was taken to prevent the rails from being felt by any vehicle passing in the street. They were to be even with the pavement, to be laid in the center of the street, to be not over twelve and a half feet apart between the outer rails, and to have grooves not exceeding an inch in width. 2. The provisions as to sweeping the streets, stationing attendants at the crossings, and getting rid of the crowd of omnibuses, show that the safety, health, comfort and convenience of the public were carefully attended to. 3. Nor would the *cars* interfere with the ordinary use of the street for other vehicles. At present 527 omnibuses pass the museum during the hour of heaviest travel, and the most that they do is to carry 2808 passengers up and 833 down. The same work would be done by 47 cars up and 14 down: so that there would be taken from the street 527 omnibuses and 1054 horses, passing every hour, and their places supplied by 61 cars and 122 horses : relieving the street during 13 hours of travel of 12,116 horses and 6,058 vehicles ; and comparing the space taken up by 793 cars ($61 \times 13$) with that occupied by 6851 omnibuses, ($527 \times 13$) the saving in space occupied by public vehicles and their horses during the 13 hours, would be over 500,000 square feet; which is equivalent to widening the car-

Milhau *v.* Sharp.

riage way of the street more than twenty feet. The apprehended inconvenience from a continuous line of cars, is imaginary. Sixty-one cars passing each hour would be more than 450 feet apart, measuring from the rear of one car to the horses of the succeeding. 4. The preference given to the defendants over the competing applicants, was properly given. Supposing the terms offered by all the applicants to be equally favorable to the city and the public, the defendants were entitled to it, because they were the first to ask it, and had made great efforts, and incurred great expense, to show the practicability and benefit of the railway. The corporation had no power to receive from any of the applicants terms more favorable to the city, than the regular license fee provided by the present resolution. If, however, the corporation had been free to accept a bonus from applicants, it ought not to have accepted any of the other applications, because there was good reason to believe that the applicants would not make the road and pay the city. Not a single application was made by a friend of the road. Every application came from a quarter not only hostile in fact, but committed against the road, by denials of its legality, prophecies of its failure, and threats of its overthrow. Security offered would have been of no avail, because it was known to be a part of the plan of resistance, to get the road into the control of enemies, while other enemies should play into their hands, by procuring an injunction against the work, which nobody should ever move to dissolve. No prudent legislator, desirous to have the road made, would commit it to such hands. The terms on which the defendants took the license, were more burdensome to them, and more favorable to the city and the public, than any terms offered by others. The defendants are required, by the terms of this license, to keep in repair the space between the rails, to provide a depot at the foot of Broadway, to station an attendant at every stopping place in the crowded parts of the street, and to sweep and clean the street every day before 9 A. M. in winter, and 8 A. M. in summer, conditions which would cause them an expense of at least $141,708 a year. Besides this they were required to purchase six lines of Broadway omnibuses, (241 omnibuses, and

Milhau *v.* Sharp.

1500 horses,) at a cost of $450,000, exclusive of the expense of stables, about $50,000 more. There were six other applications, the two best of which were, one to give $100,000 a year for ten years, with three cents fare, and the other to take the grant on the terms of the present resolution, with three cents fare; *but neither contemplated the carriage of passengers except on the railway, and neither was accompanied with the offer to purchase out the omnibuses.* The defendants' plan was to make the railway a trunk line, and to intersect it with a line of their omnibuses, every four or five streets, from river to river, and they gave a pledge for the fulfillment of this intention, in the purchase of the omnibuses and horses. With all this public accommodation and these combined routes, they are allowed to charge no more than five cents from any one point to another. If the others had got the grant there was nothing to bind them to take passengers on the cross routes, who would thus be left to detached lines of omnibuses. Comparing the offers then we have these results. *First.* As to the offer of $100,000 a year, for ten years, and three cents fare. 1. *In respect to the charge upon the grantees.* They would have paid *for a track in Broadway* $100,000 a year, making at the end of the ten years, at 7 per cent, $1,315,000. We pay $500,000 now, which, in ten years, will make $850,000, to say nothing of the annual expense of keeping up the lines of omnibuses. Add $141,708 a year, the estimated expense of fulfilling two of the conditions of the license, and in ten years they will make, with interest, $1,863,460, so that we pay in the ten years more than they would pay, by $1,398,460. 2. *In respect to the benefit to passengers.* They convey for three cents on Broadway; but all who go from or to the cross streets, must pay the omnibus fare also, and that cannot be less than five cents. Suppose half the people to live on the line of Broadway, the average price paid by passengers will be 5½ cents each. If we were to take the plaintiff's calculation, which however is greatly exaggerated, that 30,000,000 passengers go in a year, this would give (half paying three cents, and half eight) $150,000 a year paid by travelers, if this offer had been accepted, more than they will have to pay under our license.

Milhau *v.* Sharp.

When a passenger has to go from river to river this difference will be still more increased. For example, a person starting from the foot of 23d-street, Hudson river, to go to the foot of Grand-street, East river, would have to pay under their offer, thirteen cents; under ours, five cents. 3. *In respect to the benefit to the city.* It is of the greatest importance to promote the rapid settlement of the upper wards, and divert those who do business here, from residing in adjacent cities. This will increase the taxable value of property on the island far more than enough to counterbalance the payment into the city treasury of $100,000, or even $500,000 a year. What will do this so well as the scheme which the defendants propose, of opening the whole of the upper wards to easy and rapid communication with the lower, and bringing every person on the inhabited parts of the island within two blocks of a public conveyance, in correspondence with the trunk railway along the ridge of the island? *Second.* As to the offer to take the grant under our resolution, with three cents fare. The grantees in that case would pay nothing for omnibuses, and thus save the $1,315,000 in the ten years; while the passengers would pay more than they would under our license, and the city would lose the benefit of our comprehensive scheme of intercommunication between the different parts of the island.

VI. Whether the rails laid, and the cars running in Broadway, will or will not be a nuisance, is a question that may be raised hereafter, when the experiment has been made, on the application of aggrieved persons, by a criminal or civil proceeding. This court cannot know, before trial, that a railway in Broadway will be a nuisance; and till then the court cannot interfere by injunction, at the suit of either a tax-payer or an owner of a Broadway lot. If the railway be found on trial to be a public nuisance, an action may lie, at the suit of the attorney general, to suppress it. (*Lansing* v. *Smith,* 8 *Cowen,* 146. *Dougherty* v. *Bunting,* 1 *Sandf. S. C. R.* 1. *Ripon* v. *Hobart, Cooper's Sel. Cases,* 33. *Olmsted* v. *Loomis,* 6 *Barb.* 152. *Attorney General* v. *Mayor of Liverpool,* 1 *My. & Cr.* 171. *Meserole* v. *Mayor of Brooklyn,* 26 *Wend.* 132. *Van Doren*

---

Milhau *v.* Sharp.

---

v. *Mayor of N. Y.*, 9 *Paige*, 390. *Hodgkinson* v. *L. Island Railroad Co.*, 4 *Edw.* 411. *Adriance* v. *Mayor of N. York*, 1 *Barb. S. C. Rep.* 19. *Brower* v. *Same*, 3 *Id.* 255. *Livingston* v. *Hollenbeck*, 4 *Id.* 9. *People* v. *Mayor of New-York*, 5 *Id.* 43. *Waddell* v. *Same*, 8 *Id.* 95. *Reynolds* v. *Mayor of Albany*, *Id.* 597. *Rochester White Lead Co.* v. *City of Rochester*, 3 *Comst.* 463.)

EDWARDS, P. J. The plaintiffs in this case allege that the · street in the city of New-York, known and designated as Broadway, is an ancient street, which was opened about one hundred and fifty years ago, by the then owners of the lands over and through which the street passes, for their own convenience, and was by them allowed to be used by citizens and travelers as a common public street or thoroughfare. They further allege that they are, each of them, owners in fee of certain lots of great value situated upon the street, and that they believe they are owners in fee of all the lands in front of their lots to the center of the street, subject only to the easement or right of way over the same; and they also allege that they are tax payers to a large amount by reason of their ownership of this and other property in the city. They then state that previous to the presenting of their complaint, the boards of aldermen and assistant aldermen of the city, in opposition to the veto of the mayor, and in violation of the injunction of the highest local court in this city, passed a resolution by which they authorized and granted permission to the defendants to lay a double track for a railway in Broadway and Whitehall or State-street, from the south ferry to Fifty-ninth-street, and thereafter to continue the same, from time to time, along the Bloomingdale road to Manhattanville. There were certain conditions attached to this grant, to which it is not now necessary to allude, and there are certain allegations contained in the complaint as to the circumstances under which the authority and permission were granted, which it will be necessary to consider hereafter. The plaintiffs then insist and contend that the mayor, aldermen and commonalty of the city, have no right by virtue of their corporate powers, either as

established by their charter, or conferred upon them by the legislature, to authorize the railroad in question. They further insist that, owing to the peculiar situation of Broadway, both in reference to its width, and its use for general purposes as a street, the proposed railway track, if permitted to be used as the defendants intend to use it, will become a nuisance. They also contend that the right to use the street in the manner proposed, can only be acquired by an express authority, delegated by the sovereign power of the state, by virtue of the right of eminent domain, and that it would be necessary as a condition precedent to the exercise of such authority, to make compensation to the owners of the adjoining property. And, finally, they contend that the grant to the defendants has been corruptly and illegally made. Upon these grounds they pray for an injunction to prevent the grant from being carried into effect.

I conceive that the question as to the general power of the corporation to authorize the laying of a railway track in the city has already been settled in the case of *Drake* v. *The Hudson River Railroad Company*, (7 *Barb.* 528.) As I have always understood that case, there were two questions distinctly passed upon, and decided by the court. First, that a railway in a city is not *per se* a nuisance or a purpresture ; and, second, that the corporation of the city of New-York has the power and right to authorize the use of its streets for that purpose. It was contended upon the argument that the case before us is distinguishable from that, because in that case the legislature had, by its charter to the railroad company, authorized it to carry its road into the city. But it will be observed that this authority is made to depend entirely upon the assent of the mayor, aldermen and commonalty of the city. The corporate right, as an artificial existence to receive the benefit of the assent or permission thus given, is all that was granted by the state. The right to use the streets of the city came entirely from the corporation of the city. So in the case of *Plant* v. *The Long Island Railroad Company*, (10 *Barb.* 26,) it was held that the corporation of the city of Brooklyn, whose powers do not differ essentially from those vested in the corporation of this city, had the right to au-

thorize a railroad company to tunnel a public street for the purpose of laying a railway track.　And in the case of *Adams* v. *The Saratoga and Washington Railroad Company,* (11 *Barb.* 414,) a similar power was recognized in the village of Whitehall.　(*See also Chapman* v. *The Albany and Schenectady Railroad Company,* 10 *Barb.* 360.)　In each of these cases the recipient of the right or thing granted was a body corporate, created by an act of the legislature, but in every case the right or thing granted was given by the city or village corporation, by virtue of its general powers over its streets.

The next ground upon which the plaintiffs claim that the laying and using of the railway track in question will be illegal is, that it will be a nuisance.　As has been already seen, it was settled in the cases above cited, that a railway in a city is not necessarily a nuisance.　But no one can doubt that, under certain circumstances, it might become so.　If, for example, a railway with a double track should be laid down in some of the narrow streets of this city, which are, even now, inadequate to the public wants for ordinary business purposes, it is apparent that the public use would necessarily be impaired, if not entirely obstructed.　The plaintiffs contend that this case is also an exception to the general rule.　But I do not think that the facts presented in the papers before us warrant such a conclusion. And it seems to me that no one will seriously deny that the track in question might be used, or rather I will say, that there is no certainty that it would not be used, in such a way as materially to impair and obstruct the public right of passage and re-passage through and over the street.　But such a possibility would not be sufficient to authorize the interference of the court at this time.

The next ground upon which the plaintiffs claim that they are entitled to the interference of the court is, that they are owners of the fee to the center of the street, subject only to the public right of way, and that the street cannot be taken for the railway until compensation is first made to them.　The grounds on which they claim the ownership of the fee are, that they are seised in fee of the lots adjoining the street, and they contend

Milhau *v.* Sharp.

that, from this fact, the law implies their ownership *ad medium filum viæ* : and that the burden of proving the contrary, rests upon the defendants. The defendants on the other hand, have introduced an affidavit of a distinguished member of the bar, who, it appears, has been employed by the corporation, and for some time past has been engaged in preparing a digest of the ancient records, in reference to the title of the corporation to the streets of the city. This affidavit is, to a considerable extent, argumentative, and consists of a statement of facts with inferences and conclusions; but the facts stated are sworn to be true upon information and belief. Assuming all the facts stated, to be true, still I am not prepared to say that it is shown that the fee of the lands in Broadway, above Wall-street, is vested in the corporation of the city. Neither am I prepared to come to a different conclusion. On the contrary, after a careful reading of the affidavit, and after hearing the statement made by the venerable and learned counsel, who argued this motion on the part of the defendants, it would only be upon the most thorough examination that I would come to the conclusion that the fee of the streets is not vested in the corporation, as, for manifold reasons, I think that it ought to be—in trust, however, for the public benefit—as all the streets, laid out and opened under the act of 1813, are. But, with the view which I have taken of this case, I do not consider it necessary to its adjudication to determine who is the owner of the fee.

The counsel for the plaintiffs referred us, in their argument, to the numerous decisions which have been made in this state, in reference of the right of the adjoining owner, to the soil in a public highway. There is no doubt that, according to the ancient rule of the common law, which as far as I am aware has always been adopted in this state, the public have no other right in a highway in the country than that of passage and repassage, and that any interference with the soil, other than such as may be regarded as necessary to the enjoyment of this right, will be considered a trespass, and an action will lie in favor of the owner of the fee. It is upon this principle that the case of the *Trustees of the Presbyterian Society in Waterloo* v. *The*

*Auburn and Rochester Railroad Company,* (3 *Hill,* 567,) was decided. But there is a wide difference between a highway in the country, and a street in a populous commercial city. The reason for the restricted use of highways in the country has been, that they have been needed for no other purposes; but such is not the case with streets in a city. There are certain uses to which, in modern times, the latter have generally been applied. These uses are not merely conducive to, but they have become almost necessary for the comfort, health and prosperity of the public. They have been sanctioned by custom, and approved by experience.

By the Dongan charter, the then existing streets within the city were expressly granted to the corporation, together with the power of laying out such streets in future as might be needful and convenient; and the general control of the streets, as such, has always been vested in the corporation, as the protector and manager of the public rights, for the common benefit of all. These streets, for many years, have been used for the construction of sewers, and for the laying of water and gas pipes, and no one has ever seriously questioned the right of the city to authorize their use for such purposes, and no adjoining owner, as far as I am aware, ever pretended to claim compensation for such use. These urban servitudes, as they have been called, are the necessary incidents of a street in a large city; and whether the streets be laid out and opened upon property belonging to the corporation, or whether they became public streets by dedication, or by grant, or upon compensation being made to the owner of the fee, they have all the incidents attached to them which are necessary to their full enjoyment as streets. It is an elementary principle of the law that where a power, right, or thing is granted, either to a natural or an artificial person, all the incidents are granted which are necessary to the enjoyment of the power, right, or thing. And whether the corporation be the owner of the fee of the streets in trust for the public, or whether it be merely the trustee of the streets and highways as such, irrespective of any title to the soil, it has the power to authorize their appropriation to all such uses as are conducive to

Milhau *v.* Sharp.

the public good, and do not interfere with their complete and unrestricted use as highways; and, in doing so, it is not obliged to confine itself to such uses as have already been permitted. As civilization advances, new uses may be found expedient. It was upon this principle that the existing railways in this city and in Albany, and the tunnels in the city of Brooklyn and in the village of Whitehall have been sanctioned.

The next question is, whether the corporation had the right to make the grant, under the circumstances and in the manner that they have done. The mayor, aldermen and commonalty of the city of New-York, are a public municipal corporation, existing originally, perhaps, by custom, but at an early period authorized by a written charter, and since by legislative enactment. A public municipal corporation is always created for political purposes. It is invested by the sovereign power with subordinate legislative powers, to be exercised within certain local limits. Its powers are subject to the control of the legislature. (2 *Kent's Com.* 275. *People* v. *Morris,* 13 *Wend.* 325.) Its charter is not a contract, within the meaning of the constitution of the United States, and may be altered or amended. (*Dartmouth College* v. *Woodward,* 4 *Wheat.* 518.) It has the power to make laws for its better government, without any express grant. In the case of the *City of London* v. *Vanacre,* (5 *Mod. Rep.* 438,) Lord Holt, in giving the judgment of the court, said, " We are of opinion that this privilege of making by-laws and ordinances is vested in the city, of common right, if not by custom, for that it concerns the good and better government of the city; and every city and town corporate may by an essential power inherent in their constitution, make by-laws for the advantage of the government of the body politic; and this is the true touchstone of all by-laws, which ought to be for the administration of the government with which they are intrusted." It has also been held that where the charter gives the corporation a power to make by-laws, it can only make them in such cases as it is enabled to do by its charter; for as it is expressed by the court, such power given by the charter "implies a negative that they shall not make by-laws in any other

case." (*Childs* v. *Hudson's Bay Co.*, 2 *P. Wms.* 237.) In the present case we are not left to inference, for the Montgomery charter expressly confers upon the common council of the city of New-York, the power to make such laws as to them or the greater part of them, shall seem to be good, useful, or necessary for the good rule and government of the body corporate. Thus it will be seen that as far as it acts in the exercise of its public political powers, and within the limits of its charter, it is vested with the largest discretion. And whether its laws are wise or unwise; whether they are passed from good or bad motives, it is not the province of this court to inquire. But, as regards the acts of the corporation in reference to its private property, it stands upon a very different footing. Such property is held for the common benefit of all the corporators. In respect to that, the corporation is charged with high duties. It is the depositary of a trust which it is bound to administer faithfully, honestly and justly. And no one will contend that the body of men, who for the time being, may be its duly authorized representatives, can legally dispose of its property of great value, without any or for a nominal consideration; and if they shall presume to do so, it will be no excuse for such a gross and unwarrantable breach of trust to say that they acted in their legislative capacity; for the very simple reason that they will not act in that capacity. They will be acting in reference to the private property of the corporation, and, in this respect, will stand upon the same footing as if they were the representatives of a private individual, or of a private corporation. The mere fact that the forms of legislation are used, will make no difference in the character of the act. It will be in no sense the exercise of a political power delegated for public purposes. If the mere form of proceeding defined the act, then it might be said that most of the acts of private corporations are legislative acts. Banking corporations, and railroad and insurance companies, have a board of directors and a president, who transact the business of the company. They have their regular meetings; they have a presiding officer, and their deliberations, discussions and proceedings, are conducted more or less according to parliamentary rules. But no one ever

Milhau v. Sharp.

supposed that any of their acts were of a legislative character; and for the obvious reason that they have reference to private property. When a public corporation acts in reference to its private property, its acts are equally of a private character, and equally subject to judicial control. If a different doctrine were established, the mayor and aldermen of the city of New-York might, at the next meeting of the common council, distribute the whole of the property owned by the city among themselves, provided that they adhered to the ordinary forms of legislation. The distinction which I have taken is well sustained by authority, as it is by reason and principle. In the case of *Frewin* v. *Lewis*, (4 *Mylne & C.* 249,) which was a suit against the poor law commissioners, who are a *quasi* public corporation, Lord Cottenham, in giving his opinion, said " So long as these functionaries strictly confine themselves within the exercise of those duties which are confided to them by law, this court will not interfere. The court will not interfere to see whether any alteration or regulation which they may direct is good or bad, but if they are departing from that power which the law has vested in them, if they are assuming to themselves a power over property which the law does not give them, this court no longer considers them as acting under the authority of their commission, but treats them, whether they be a corporation or individuals, merely as persons dealing with property without legal authority." In the case of *Bailey* v. *Mayor, &c. of N. Y.* (3 *Hill*, 531,) it was held that the Croton aqueduct was a part of the private property of the city; and that, in regard to such property, it stood in the same light as an individual owner, and was subject to the same liabilities. In the Dartmouth College case, the same distinction between the public powers of a municipal corporation, and its private property was recognized. In the case of *Moodalay* v. *The East India Company*, (1 *Bro. Ch. R.* 469,) the master of the rolls, in speaking of the defendants, said: " They have their rights as a sovereign power; they have also duties as individuals. So, in this case, as a private company they have entered into a private contract, to which they must be liable." And in the case of *Att'y General* v. *The Mayor of Liverpool*, (1 *M. & C.*

171,) the master of the rolls says: "If property is held by a corporation as a trustee, if the corporation holds it clothed with public duties, the court has always asserted its right to interfere."

Before proceeding to the application of these principles to the case before us, it will be necessary to determine what is the character of the grant made by the corporation to the defendants. Their counsel call it the grant of a permission. But this conveys no definite idea. The grant of lands is the grant of a permission to have the absolute and unqualified ownership of them. A lease of a house is the grant of a permission to use and occupy it for a limited time. In order to determine what the corporation has done, it will be necessary to ascertain what is the character and effect of this permission which it has granted. According to the provisions of the resolutions passed by the common council, the corporation has granted the permission and authority to lay a double railway track in Broadway. For the purpose of laying this track, it will be necessary that the defendants shall, for a time, take the exclusive possession of a part of the street; that they shall place a structure there of their own construction, which shall belong to them, and of which they shall have the exclusive use, as far as it is used for a railway. In my judg·ment, it is immaterial what particular name is given to this thing which is thus granted. Whether it be a thing corporeal or incorporeal, or whatever be its correct legal designation, it is a species of property of some kind. It is a property held by the city, and is subject to the same trusts and duties as its other property.

The question then arises whether the corporation has violated its duty as a trustee in making the grant in question. It will be observed that the defendants have paid nothing for the grant, and that the only amount which they will be bound to pay to the city, will be the annual license fee for each car which is now allowed by law, and they have agreed that no higher rate of fare shall be charged for the conveyance of passengers from any one point to any other point along the route, and such combined system of routes as may hereafter be adopted by means of cars and omnibuses, than five cents for each passenger. It is stated in the complaint, and it is not denied, that six offers were made

Milhau *v.* Sharp.

to the corporation by other parties than the defendants, and the complaint alleges that one of them, if accepted, would produce a sum exceeding $250,000 per annum for the benefit of the corporation, and the relief of the tax-paying citizens, while each passenger would be charged but five cents fare. That another offer, if accepted, would produce a sum exceeding $300,000 per annum for the benefit of the corporation, while each passenger would be charged but five cents fare. That another offer, if accepted, would produce the sum of $100,000 per annum for the benefit of the corporation while each passenger would be charged but five cents fare. That another offer, if accepted, would produce the sum of $1,000,000 for the benefit of the corporation, while each passenger would be charged but three cents fare. That another offer, if accepted, would produce the sum of $150,000 per annum for the benefit of the corporation, while each passenger would be charged but three cents; and finally, that an offer was made in which the parties agreed to comply in all respects with the terms and conditions set forth in the resolutions by which the grant was made to the defendants, with the exception that instead of charging five cents for each passenger, they would charge but three. The defendants do not deny these allegations, but they have submitted an affidavit sworn to by two of them, in which they say, that either of these offers, if accepted and carried out, would have been *less burthensome to the grantees* in the amount of money to be expended, and less beneficial to the citizens than the grant made to the defendants. And they state as one of their reasons, that none of the offers which were refused, excepting one, proposed to take the grant upon the same terms and conditions as the grant made to them. But what are those terms and conditions? It will be seen by reference to the resolutions that they are, generally, regulations as to the manner of laying the rails, and constructing and managing the cars, which would not be onerous to the grantees, and which would be adopted by any one, almost as a matter of course. The only important provision is that which relates to the sweeping of the street. But the expense of carrying this provision into effect would amount to a

sum very far less than that which the other parties agreed to pay to the corporation. They next state that the offer which proposed to take the grant upon the same terms and conditions as were agreed to by the defendants, was not accompanied by any purchase, or offer to purchase, the lines of omnibuses now established upon Broadway, whereas they allege that they, through their representatives, had made contracts with six of the principal omnibus lines in Broadway, owning two hundred and forty-one omnibuses, to buy out their lines, for the purpose of withdrawing the omnibuses from Broadway, and with a view of transferring them to transverse lines to run in communication with the railway. But, if they had made these contracts, why had they done so? They were not bound by the terms of the grant to make these or any similar contracts. They say in their affidavits that they made the contracts "as a measure of justice and proper public policy." Was it from a sole regard to these considerations, or was it not rather from a regard for their private interests? The affidavit itself undoubtedly states the true reason; "It was necessary to the successful working of a railway in Broadway at all." And is it not a just conclusion that the same motives of self-interest which influenced the defendants, would have induced the grantees, whoever they might be, to do the same thing? But it is said that those offers were not made in good faith. The papers before us show the circumstances under which they were made. They were made by the owners of property upon Broadway, by parties who had zealously opposed the railroad, because they believed that its construction and user would be injurious to their property. They had appeared before the common council and urged their objections, and when they found that their opposition would be unavailing, they said "Then give us the grant. We believe that it will be exceedingly valuable. We are willing to pay a liberal consideration, and we believe that in this way we shall derive some compensation for the injury which we think that we shall sustain by the depreciation of our property." They said this at that time, and they say it now; and in this I can see neither inconsistency nor bad faith. But it is said, and

Milhau *v.* Sharp.

some conversations are stated in the defendants' affidavits for the purpose of showing that the other parties intended, in case they received the grant, to allow themselves to be restrained by legal proceedings from carrying it into effect. I suppose that the question whether they would be restrained or not, would depend upon the question whether they were proceeding illegally or not ; and that the rule of law would be the same whether applied to them or to the defendants, or to any one else. But it is is said that they would have allowed an injunction to be obtained and would not have moved for its dissolution. Suppose that they had, would that have defeated the road ? Would the corporation in the proper discharge of its duties, have allowed what it believed to be a valuable work, highly beneficial to the public, and of great advantage to the city treasury to be thus arrested ? Or would it not have defended the grant which it had made, in case it became necessary to do so ? It would have had the right and it would have been its duty to defend it. But to remove all question upon this point we have the affidavits of the parties themselves, who are men of high respectability and of abundant pecuniary responsibility, and they positively swear that their offers were made in good faith, and for the purposes therein expressed. And in one case it appears that the parties gave satisfactory security for the faithful performance of their agreement. Surely this is enough to countervail any number of allegations founded on mere suspicion.

In deciding as to the comparative merits of the offer which was accepted, and the offers which were rejected, the question is not, as the defendants seem to suppose, as to what amount of burthens have been assumed by the grantees. But even if it were, it seems, from their own showing, that they have received, or will receive, a full equivalent in value for the burthens which they have thus disinterestedly assumed. The true question is, what amount of benefit might have accrued to the city in case that the most advantageous offers made had been accepted ? And in this point of view there can be no other conclusion than that the corporation has shown an entire disregard of the public interest, and of its own duties. If it had accepted the offers

which it refused, the burthen upon the tax-payers would have been reduced, to the same extent to which the public treasury would have been benefited.

But it was said, upon the argument, that the corporation had no right to receive any compensation. If they had the right to make the grant, they had the right to be paid for it. The power of granting any thing, implies the right to attach conditions to the grant; and it is immaterial whether the grantor be a corporation or an individual. One of the reasons given on the argument why the corporation could not receive compensation, was, that it had been deemed necessary to apply to the legislature for express authority to license hackney coaches. But there is no analogy between the two cases. The act of 1813 gives to the corporation the power and authority to regulate hackney coaches or carriages, and the owners and drivers thereof, and their rates of fare or carriage, requiring the owners of such hackney coaches or carriages to have a license from the mayor of the city, under the direction of the common council. And it further provides, that whoever shall obtain such license, shall pay therefor a sum not exceeding five dollars for each hackney coach or carriage, to be applied to the support of the poor of the city. (2 *Laws of* 1813, *p.* 446.) This act, it will be seen, merely gives a power to make a police regulation, accompanied with a power to levy a tax upon certain species of property for a particular purpose. It neither gives, nor does it profess to give, the power to receive compensation for any property granted, or for the granting of any right which the city already possessed the power to grant.

The conclusions to which I have arrived, for the reasons which have been stated, are, that the corporation, in making the grant in question, was guilty of a clear breach of trust; and that this court is bound to prevent the grant thus illegally made from being carried into effect.

The next question to be considered is whether the suit has been brought by the proper parties. It was held in the case of *Christopher* v. *The Mayor, &c. of New-York,* (13 *Barb.* 567,) that a tax-payer in the city might restrain the corporation, and

Milhau *v.* Sharp.

the parties claiming under them, from doing an act which amounted to a breach of trust, and which was injurious to the party as a tax payer. The rule of the common law, as established in England, was, that in cases where an act was done by a corporation, which was not particularly injurious to any individual corporator or corporators, it was necessary for the parties who felt aggrieved to relate their grievances to the officer of the crown, who might, if he thought the case a proper one, file his information against the corporation. In such a case the suit would be brought in the name of the attorney general, on the relation of the parties complaining, instead of being brought in the name of the parties themselves. But even in England it has been held that although the proceeding must be by the attorney general, in a case where all parties interested were parties to the abuse, yet that where such was not the case, it was not necessary that he should be before the court. (*Bromley* v. *Smith,* 1 *Simons,* 8.)

I think that the plaintiffs in this case, being tax payers to a large amount, have such an interest in preventing the grant in question from being carried into effect, that they had a right to institute this suit in their own names ; and I am of opinion that an injunction should be issued against the defendants in pursuance of the prayer of the complaint.

S. B. STRONG, J. The plaintiffs allege that the resolutions of the common council of the city of New-York, purporting to authorize the construction of a railroad in Broadway, are void ; and ask that the defendants may be restrained by an injunction from this court from entering into, or upon, that street, " for the purpose of laying or establishing a railroad thereon, and from digging up, or subverting, the soil, or doing any other act in such street tending to encumber the same, or" (to) " obstruct the free and common use thereof, as the same has been heretofore enjoyed." The objections which have been advanced against the resolutions are numerous, and have been discussed by the distinguished counsel for both parties, with much zeal and great ability. I shall state the conclusions which I have

adopted on such of the points raised as I deem material; and I intend to do but little more, as I have neither the time nor the inclination to elaborate an opinion.

It has been contended that the common council has not the power to authorize the construction of any railroad in the city. The charter from Governor Dongan gives, grants, ratifies and confirms, to the corporation, all and every the streets, lanes, highways and alleys within the city, for the public use and service of the mayor, aldermen and commonalty of the said city, and of the inhabitants of Manhattan Island, and travelers there, and confers a power to establish, appoint, order and direct the establishing, making, laying out, ordering, amending and repairing the same, necessary, needful and convenient for the inhabitants, and travelers and passengers." The only limitation or restriction of this grant is contained in, and consists merely of, a provision for the protection of private rights. The charter from Governor Montgomerie, ratifies and confirms this delegation of power. Chancellor Kent remarks, in his notes and illustrations, prepared at the request of the common council, (p. 238,) that " the charter powers" (relative to the streets) " have been so frequently and so fully confirmed, defined, enforced, and specially applied by legislative acts, that there seems to be no want of jurisdiction from the one source or the other, *for every exigency.*" The common council has certainly a very liberal discretion as to amending the streets, and may, in the exercise of it, authorize the construction of a railway, if that is deemed to be an amendment. I know of no limitation except that imposed by the charter for the protection of private rights, and that which is always implied in a public grant, that there shall be no perversion of the main object for which it was made. As to private rights, it does not appear very clearly that any such could be affected by a railroad granted on proper terms, at all. The plaintiffs allege that they are proprietors of lots on the westerly side of Broadway, and that they verily *believe* that they are the owners in fee of all the lands in front of their respective buildings to the center of that street. Now when a party asks for relief on the ground of a threatened injury to his

Milhau *v.* Sharp.

property, he is bound to aver his title in positive terms. That lies, or should lie, within his own knowledge; and if that is not sufficient to warrant a direct and unqualified averment, it cannot justify the interposition of this court. We are bound to act, and especially in so important a matter as restraining parties from the enjoyment of their apparent rights, upon facts, and cannot proceed upon mere belief. But if the plaintiffs have the ultimate fee to the land opposite their respective lots, to the middle of the street, it by no means follows that their proprietary rights will be invaded, or their property taken, by the construction of the proposed railway. Their title is subject to the public right to use it as a city street. The public has acquired the privilege of using it as a full passway. There was no restriction to any existing or other method of travel when the land was dedicated to, or taken by the public. The purpose was general, and sufficiently extensive to embrace any species of locomotion which any individual or the public might choose to adopt. A railway furnishes new facilities for traveling, and is designed solely for that purpose. There is no diversion to any purpose other than that for which the land was taken. Nor is the land *on which the rails are laid* rendered less valuable to the proprietor of the fee. He sustains no direct injury. If the value of the adjoining lots is impaired, that is a consequential injury, resulting from a public improvement; and for that the law gives no compensation. When, therefore, the public has acquired the right to use the land as a street, and merely subjects it to a new and improved method of traveling, the proprietor of the nominal fee loses no property, and the constitutional guaranty is not invaded. If a railway furnishes an improved means of travel, it cannot be inconsistent with the object for which the street was obtained, but rather harmonizes with and promotes it; unless, indeed, it should exclude the inhabitants of the city and " travelers there" from the free and appropriate use of the passway, or should in some way constitute a nuisance. The rails should undoubtedly be so laid as not to obstruct the free passage of the street, and we were assured upon the argument, and no fact was stated to the contrary, that the resolutions in question contained provis-

Milhau *v.* Sharp.

ions which, if fully carried out, would effectually prevent any obstruction. That they will not necessarily impair the passage in any other manner, is evident from the fact, that rails laid in other streets in the city have not been productive of any inconvenience. It has been supposed by many that a railroad in a city or populous village, was necessarily a public nuisance, whether the cars upon it were drawn by horses or by locomotives propelled by steam. The supreme court of this state has frequently decided otherwise. In the case of *Hentz* v. *The Long Island Railroad Company*, (13 *Barb.* 646,) I had occasion to examine this question very fully, and came to the conclusion not only that the authorities were too strong to be got over, but that they were right. There may be circumstances which would render a railway and the travel upon it very injurious, and possibly a nuisance in some localities, but they do not exist in this case. From the statements contained in the report of the majority of the committee of the common council, which is an exceedingly well written document, I am satisfied that the proposed railroad would not be a nuisance, but would, on the contrary, be a great relief to Broadway. I have no doubt of the power of the common council to authorize its construction, in a proper manner and upon proper terms. If my opinion on this point should need confirmation, it would have it from the circumstance that the principal opponents of the existing ordinance, who were proprietors of stores and dwelling houses on Broadway, and men of much intelligence, who had the ability to, and no doubt did, obtain the best legal advice, themselves applied to the common council for the grant of a similar privilege, but upon terms more onerous, and which would have required from them an immediate and extensive appropriation of money.

The principal objection to the resolutions, and those entitled to the most consideration, resulted from the circumstances attending their adoption, and their terms. It was contended on the argument, that the adjournment of the board of aldermen from the 4th to the 8th day of November, being for more than three days, put an end to that monthly session of the board, at which the resolutions in question were adopted; and that when

Milhau *v.* Sharp.

the board subsequently met in pursuance of the adjournment it was not a legal assembly, and could do no valid act. It is provided by the 4th section of the act of April 2d, 1849, that "neither board shall adjourn for a longer period than three days, except by a resolution to be concurred in by the other body." The 7th of November last was Sunday, and if that is to be counted, the adjournment of the board of aldermen from the 4th to the 8th of that month was for more than three days, and being made without the concurrence of the board of assistants, was unauthorized. In the construction of a statutory provision relative to the time prescribed for any purpose, Sunday is sometimes included and sometimes not. The inclusion or exclusion depends upon what is to be done within the prescribed period. If *early* and not continuous action is requisite Sunday is counted, as that will not interfere with the main design. Thus the object in giving a notice of time is to enable a party to send for his absent witnesses who may be at a distance, or to subpœna those who might otherwise leave their homes, at an *early* day, and not to furnish a period which might be requisite for *constant exertion.* So where there is a notice for a special motion, it may be necessary to procure affidavits from persons at a distance, or of persons about leaving home, and an early, rather than constant, exertion is essential. In such cases Sunday is considered as a part of the required time, because the object to be accomplished does not call for its exclusion. But the provision relative to adjournments which I have quoted has reference to days of action, and to those only. The design is that the proceedings of the common council shall not be delayed for more than three days by one board without the consent of the other. Sunday is not a proper day for the performance of secular business, and therefore it should not be considered as any part of the time limited by the provision relative to the adjournment of either board. Where the adjournment is for three week days and Sunday, the business of the common council is in fact interrupted only three days. It is for this reason that the congress of the United States and the legislature of this state have uniformly given the same construction to similar provisions in the constitutions un-

der which they respectively acted. The legislature of this state, when enacting the provision in question, may well be supposed to have had reference to their practical construction of similar language in reference to their own powers. Thinking as I do, that the adjournment was fully authorized, it is not necessary to inquire whether, if it had been illegal, that would have nullified a subsequent meeting of the same board, or the after joint action of the two branches of the common council.

It was strenuously contended by the plaintiffs' counsel, that the grant to the defendants was void because it was made in defiance of an injunction allowed by a justice of the superior court of the city of New-York, in a suit instituted by Thomas E. Davis and Courtlandt Palmer against the mayor, aldermen and commonalty of that city. That injunction certainly purported to prohibit the corporation from making the grant to the defendants. But the present defendants were not parties to that suit, nor is it averred in the complaint that the injunction had been served on them. An injunction affects the person rather than the right. If it affects the right at all it is only indirectly, through the person. In the case of *Fellows* v. *Fellows*, (4 *John. Ch. Rep.* 25,) Chancellor Kent said, " I have no conception that it is competent to this court to hold a man bound by an injunction who is not a party in the cause, for the purpose of the cause ;" and he there dissolved an injunction which had been issued against persons who had not been made parties to the suit. Should a party disobey a lawful injunction, he could of course be punished for the contempt, and he could not directly gain any thing by his disobedience. But it would not affect the rights of another party who might have dealt with him in reference to the subject matter of the controversy. If it would, innocent parties might suffer, notwithstanding all the precautions which the most prudent could take. As the present defendants were not parties to the suit in which the injunction was issued, the rights which they may have acquired in a subject matter common to both suits were not affected, unless, as the plaintiffs contend, the common council in adopting the forbidden resolutions were guilty of a *criminal* contempt, and no rights can be

Milhau *v.* Sharp.

acquired through the perpetration of a crime. This position renders it necessary that I should consider the question whether the members of the common council, in passing the resolutions in question, were guilty of any crime; and I regret exceedingly that it does so, as my examination of the subject has led me to conclusions different from those entertained by the learned judges of another court, for whom I entertain the highest respect. Their opinions are certainly entitled to great consideration, but cannot control us, sitting here. It is alleged that the members of the common council have willfully disobeyed a process of injunction, *lawfully* issued by the superior court, and have consequently been guilty of a misdemeanor under certain provisions of the revised statutes. (2 *R. S.* 278, § 10, *sub.* 3; *p.* 692, § 14.) The injunction commanded the corporation to absolutely desist and refrain from granting to the defendants the right to lay the proposed railway in Broadway, or in any manner authorizing them to do it. The common council subsequently adopted the resolution granting the forbidden right, and conferring the forbidden authority, but proceeded no farther in consummating the grant; at least no additional action as to that is set forth in the complaint. The alleged contempt, then, so far as it can have any bearing upon the efficacy of the grant, (for the condemnatory resolutions subsequently adopted by the board of aldermen, however contemptuous and improper they may have been, did not impair the previous action of the same body,) consisted simply in the adoption of the resolution for the construction of the railroad. Supposing that the injunction forbade such adoption, the question is whether it had been *lawfully* issued; for if it had not been, there was no criminality in disobeying it. If the superior court had jurisdiction to prevent the action of the common council in this matter, the injunction had been lawfully issued: otherwise not.

By the first section of the act of April 7, 1830, relative to the city of New-York, it was provided that the *legislative* power of the corporation should be vested in the two boards, who together should form the common council of the said city. This delegation of power is continued by the act of April 2, 1843. The

common council is forbidden to perform any executive duty by the ninth section of the last mentioned act, but otherwise their legislative power is co-extensive with their corporate rights. It has been seen that under the Dongan and Montgomerie charter the corporation holds the streets, and has full power to make regulations for their improvement. The adoption of ordinances or resolutions for the improvement of the streets is nowhere declared to be an executive duty, but is the exercise of a power devolved upon the common council in its legislative capacity. The resolutions making the grant in question had reference to the improvement of Broadway as a street, were pending before the common council when the injunction was issued, and that process, if effectual, would necessarily have inturrupted, and eventually prevented, legislative action. I can find no warrant for this interference, either in any legislative enactment or judicial determination. It is a familiar principle that legislative action is not subject to judicial control. This results from the distinct nature of the duties of the two departments and their co-ordinateness. Judges are elected or appointed to administer the laws, not to make them, or to interfere in their enactment. They formerly had a voice in their final passage in the council of revision in this state, but their interference was at length deemed inexpedient and improper, and the council was abolished. To interfere during the pendency, and before the passage, of a bill in either branch of the legislature, would be still more objectionable on every account. Legislative action, to be worth any thing, should be free. I do not understand that this principle is denied as applicable to our state legislature, but it is said that it does not extend to our municipal corporations. Why not? The delegation is of a part of the sovereign power, and that must pass with its inherent immunities, unless there is an express or otherwise necessary limitation. In this case there is no limitation, nor is it necessary that there should be. I mean as to the exercise of their legislative powers. There is undoubtedly a check upon the action of the common council, in the veto power given to the mayor. The statutes impose no other, nor do they permit any interference even by the mayor while the matter is

Milhau *v.* Sharp.

pending before either board. There is no necessity that the legislative action of the common council should be checked by judicial authority. Should an ordinance be passed which should be void from a want of jurisdiction, or voidable by reason of a breach of trust, or from any other cause, its further prosecution, if by any public officer, would be ministerial, or if by any other person, it would be in his private capacity, and in either case an injunction would be proper and preventive of mischief. In the present case the injunction already issued by a justice of this court has been sufficiently efficacious, notwithstanding the passage of the resolutions : not a rail has been laid, nor a stone or block removed.

If it should be said that the consideration of these resolutions by either board was not prohibited, but that the restraint was only upon their adoption, the difficulty would not be answered. It would then seem that either board might deliberate upon them, and that a vote might be taken, but that the members were restricted to voting only against them. This would be placing any member of the board who might consider that the resolutions ought to be adopted, in an unfortunate predicament— should he vote for them he would violate the injunction and put his body in peril of imprisonment; and should he vote against them he would violate his official oath and encounter a still more fearful danger. It surely cannot require any argument to prove that it is incompetent for any court thus to restrict the action of the members of any legislative body.

I have said that the injunction in question had not been sanctioned by any judicial action. I asked the counsel for the plaintiff, on the argument, if he had met with any case where a court had prevented the legislative action of a municipal corporation. He did not cite, nor have I seen, any instance of the kind, and I presume none can be found. Proceedings have frequently been had in the courts in England against the municipal corporations there, and some of them have been conducted with great zeal, and with all the influence and power of the crown. The charter of the city of London was annihilated by the arbitrary decision of the court of king's bench, presided over at the time by a judge,

Milhau *v.* Sharp.

who, as counsel for the crown, had drawn the information; but there is no case to be found where a court had attempted to prohibit legislative action. Neither has there been an instance of the kind in this state, or, so far as I know, in any state in the union. It is a strong argument against the claim of any power, without statutory authority, that it is new. It applies with peculiar force where an attempt is made to extend the common law jurisdiction of any court. In such cases, if our courts can go beyond the uniform practice, there is no limitation, and their power would be arbitrary and its exercise intolerable. I know that it has been contended that the power to grant injunctions has been extended by the junction of law and equity jurisdiction in the same tribunal. But such is not the necessary, or even probable, consequence. The court of chancery was no favorite with the convention by which it was abolished. It had become obnoxious to the people, not only for its delays and the great expense involved in its proceedings, but for its frequent and often vexatious interference with the ordinary affairs of men. It was in order to counteract, and certainly not to increase, those evils, that all equity jurisdiction was transferred to tribunals which had been previously courts of law.

Upon the whole, I am satisfied that the learned judge by whom the injunction in question was allowed, went beyond the jurisdiction of his court. Because, 1st. Such injunction was restrictive of legislative action; 2d. It was unnecessary; and 3d. It transcended the limits established by the practice of courts of equity. In my opinion, therefore, neither that nor the proceedings of the common council after it had been served on the aldermen and assistants, stand in the defendants' way.

Thus far it will be seen I am with the defendants. But there is, in my opinion, a formidable difficulty resulting from the character and consideration of the grant. It was contended by the counsel for the defendants, that all they have taken is a revocable license. If that was so, I should not feel inclined to interfere. But I have all along been under the impression that the resolutions constituted an irrevocable grant of a valuable right; and I accordingly asked some questions strongly indica-

Milhau v. Sharp.

tive of such an opinion, during the argument of the senior coun-
sel for the defendants, to which he was unable, with all his
learning, ingenuity and professional tact, (and I presume that I
may safely say that in either he is not excelled by any member
of our bar,) to give satisfactory answers. Parol licenses to do
some act upon land, are generally revocable, and therefore do
not confer any right. Some cases have held that a mere parol
license operates, when executed, as a grant; but the principle
when applied to lands is inconsistent with the provisions of our
statute relative to fraudulent conveyances, and cannot therefore
apply here. There can be no doubt but that a written permis-
sion to use land in a particular way, for a designated time, for
the benefit of the person to whom it is given, in consideration
of some act to be performed by him, is a grant of some right in
the nature of an incorporeal hereditament, and therefore confers
property upon the grantee. The resolutions in this case speak
of what they effect as the *grant* of a permission or authority.
Technically, the word grant, is inappropriate to a mere license;
but it may have been used in this instance in its popular sense,
and it is not therefore very significant of the character of the
interest intended to be conferred. The defendants are author-
ized to lay a double track for a railway, and of course to remove
so much of the existing pavement as may be necessary for that
purpose; to continue the same from time to time; to run cars
upon such rails for the conveyance of passengers, for which they
are to have licenses; to receive a compensation not exceeding
five cents for each passenger; to form an association, with the
authority to make by-laws, to transfer the *interests* or *shares*
to new associates or *assigns*, and to continue their operations
for ten years; and for a renewed term, if they and the corpo-
ration can agree as to the amount of the future license fee, or
otherwise to *surrender* the road to the corporation at *a fair and
just valuation*. Surely all these provisions indicate something
more than a mere revocable license. They convey a valuable
right, which, upon the performance of the primary acts re-
quired from the defendants, would vest in them, and of which
they could not be deprived by a repeal of the resolutions. It is

not competent even for the legislature of the state to deprive a party of a vested right, although it may have been conferred upon him by a statute. (*The People* v. *The Supervisors of Westchester County*, 4 *Barb.* 64, *and the cases there cited*.)

The right which these resolutions purport to confer, certainly bears a very strong resemblance to a franchise. The privileges granted to, and the duties exacted from the defendants, are much the same as those which appertain to the proprietors of ferries, wharves and bridges. All relate to public matters; the grantees of each have duties to perform and expenses to pay, and all are entitled to demand and receive a compensation from those who are personally benefited. It detracts not from the com-parison that the railway when finished may be freely used by all. Similar privileges are often named in the grants of bridges and ferries. In the case under consideration the grantees would have the exclusive right to carry passengers in carriages or cars running on the rails, for hire, and that, no doubt would furnish them with a liberal compensation, notwithstanding the impliedly reserved rights of the people.

There are some extraordinary features in the grant under consideration. The mayor's power to grant licenses for public vehicles is restricted, and as it has turned out, without his con-sent. Corporate powers are conferred upon the associates, and they are entitled contingently to demand the future value of the railway and its appurtenances, from the city, which might result in heavy taxation, or what might become an enormous debt. I should hesitate much before I could decide that in passing reso-lutions embracing these provisions, the common council had not gone beyond its powers. If the grant is void from the want of adequate power to make it, or, indeed, invalid from any cause, the plaintiffs, as proprietors of lots and buildings on Broadway, would be peculiarly and seriously injured by an attempt on the part of the defendants to construct the proposed railway, and they would be entitled to an injunction to prevent evils for which they could obtain no adequate redress in the law. It matters not that the resolutions were adopted by the common council in their legislative capacity. The privilege of exemp-

Milhau *v.* Sharp.

tion from judicial interference terminates where legislative action ends.

I am not, however, inclined to, nor is it necessary that I should, express any definite opinion as to the validity of these objections to the resolutions; as I concur with my brother Edwards in the opinion that the papers submitted to us prove a clear breach of trust, which invalidates the grant.

There is undoubtedly a wide difference in this respect between the acts of the state legislature and of municipal corporations. State laws are enacted by the people through their representatives in senate and assembly. They act in their sovereign capacity, and are subject to no further restrictions than such as result from their accession to the union, their own constitution, and such principles as are justly deemed fundamental in all civilized countries. They may, therefore, through their constitutional representatives, give away the public property, and no power can annul the grant as improvident or destitute of any valuable or appropriate consideration. But the city corporation is an inferior body, and has no other powers than those which have been expressly delegated to it, and their appropriate incidents. The common council has no authority under the city charter or any statute, to give away, or make an improvident grant of, the public property; nor is any such power essential to the performance of any of its legitimate duties. Its disposition of such property, including franchises, is therefore subject to the common law principles applicable to the grants made by trustees to whom the management of private property is confided. It is right on every account that it should be so. Were it otherwise, unfaithful members of the common council might squander the public property in sumptuous entertainments for themselves and their friends; pompous and expensive parades professedly in honor of the living or the dead, or presents or improvident grants to their relatives or other favorites. The evils which would result from such improper if not criminal, conduct, and particularly to the tax-payers, whose legitimate burthens are numerous and heavy, would be intolerable. The difficulty might be avoided if intelligent and honorable men only should be

elected to office. But the experience of other corporations, if not of this city, has proved that however desirable such a consummation may be, it is not always attainable.

It is evident from the papers laid before us, that propositions were made to the common council to construct and manage a railway in Broadway on terms much more advantageous to the city in a pecuniary point of view, as well as in other respects, than those contained in the grant to the defendants; so much so indeed that the difference must have been perceptible to the defendants, and they must have accepted their grant with a full knowledge that it had been improvidently made. It was said on the argument that those proposals were made for the purpose of defeating the project; but the facts stated in the papers do not establish that inference, at any rate, sufficiently to warrant correspondent judicial action. The common council might have avoided this difficulty by authorizing the construction and management of the proposed railroad under suitable conditions, and then referring it to the proper executive officer to advertise for, and receive, proposals, and to accept of those which might be the most advantageous for the city. But the two boards did not think proper to pursue a course so obviously just and proper, and the members have subjected themselves to the imputation of violating the high trust committed to them, and a measure which, properly matured and properly guarded, might have proved highly beneficial to the community, to great delay if not to eventual defeat.

The injunction should, in my opinion, be granted.

Morris, J. I agree with my brethren, up to a certain point. We all agree that the common council have authority to authorize the laying of railways in the streets of the city; that a previous act of the legislature for that purpose, is not necessary; that a railway is not in itself a nuisance, and that there is no evidence that it would be a nuisance in this particular case. But we divide upon the point, whether, in the exercise of this power, the corporation is using its private property, or exercising a governmental trust. My brethren think, that in acting in this case,

Milhau *v.* Sharp.

the corporation is disposing of its private property. I think that it is exercising a legislative and political power. And in assigning the reasons for my conclusions, I will first consider the second point presented by the plaintiffs. That point is this, that "Making the grant in defiance of the injunction out of the superior court, was an illegal and criminal act, which could confer no legal right on the grantees." I consider this point first, not only for the reason that the decision of it in favor of the plaintiffs will determine this cause, and require that the injunction should be made permanent, but also because a correct decision upon this point is of more importance to the well being of this city, and to our citizens, collectively and individually, than would be the benefit or injury to them of any railway in Broadway, or in any other street of the city. In this connection I present a series of facts admitted by the parties to this suit, viz. : On the 19th of November, 1852, the board of aldermen of the city of New-York, acting in its capacity as one branch of the legislature of the city of New-York, passed the following resolution, viz. :

" *Resolved*, That Jacob Sharp, Freeman Campbell [and 28 others who are named in the resolution,] and those who, for the time being, may be associated with them, all of whom are herein designated as associates of the Broadway railway, have the authority and consent of the common council to lay a double track for a railway in Broadway and Whitehall or State-street, from the south ferry to 59th-street, and also hereafter to continue the same, from time to time, along the Bloomingdale road to Manhattanville, which continuation they shall be required from time to time to make, whenever directed by the common council; the said grant of permission and authority being upon and with the following conditions and stipulations, to wit :"

Here follow fifteen stipulations, which, for the purpose of the point now under consideration, it is unnecessary to notice. On the 6th of December, the resolution was also passed by the board of assistant aldermen, and directed to be sent to the mayor for his consideration. On the 18th of December, the mayor returned the resolution with his objections, to the board of aldermen,

Milhau *v.* Sharp.

where it originated. The effect of this veto of the mayor was, that the board of aldermen could not proceed to reconsider the resolution before the 29th day of December, 1852. On the 27th day of December, Judge Campbell, of the superior court, upon an *ex parte* application made to him by Thomas E. Davies and Courtlandt Palmer, granted an injunction against the mayor, aldermen and commonalty of the city of New-York, in which is the following clause :

" I do hereby command and strictly enjoin the defendants, the mayor, aldermen and commonalty of the city of New-York, their counsellors, attorneys, solicitors and agents, and all others acting in aid or assistance of them, and each and every of them, that they and each of them do absolutely desist and refrain from granting to, or in any manner authorizing Jacob Sharp and others [the persons named in the resolution] or their associates, or any other person or persons whomsoever, the right, liberty, or privilege of laying a double or any track for a railroad in the street known as Broadway, in said city of New-York, from the south ferry to 57th-street, or any railroad whatsoever in said Broadway, and from breaking or removing the pavements in said street, preparatory to, or for the purpose of laying or establishing any railroad therein, until the further order of this court. And that the defendants show cause at the special term of this court, to be held at the city hall in the city of New-York, on the second Monday of January, 1853, at the opening of the court on that day, or as soon thereafter as counsel can be heard, why this injunction order should not be made permanent."

There are some considerations connected with this injunction necessary to be here stated. 1st. It not only prevents the mayor, aldermen and commonalty giving the permission to the persons named in the resolution, upon the terms specified therein, and the stipulations attached, but absolutely prevents the mayor, aldermen and commonalty from giving permission to any person or persons, upon any terms, to lay a rail track in Broadway. With this injunction upon them, (if it is legal,) they could not give the permission to the other gentlemen mentioned in these proceedings, who offer such favorable terms to the tax-

payers and citizens. Again; the order to show cause was returnable the second Monday of January, 1853—which was the ninth day of January—being several days after the expiration of the term of office of the then mayor and common council, and within which they could act on the subject. The consequence of this injunction, (if legal,) would be to postpone the consideration of the resolution until those who could act upon it, if they desired to do so, were out of office, and when the parties appeared to show cause. Although the court might decide that the corporation had a perfect right, and that it was their duty, to pass the resolutions, still the court would have no more power to restore the resolution, or to repair the injury caused by the act of their associate, than they have to resuscitate the dead. On the 28th of December, the injunction was served upon the mayor and some of the members of the board of aldermen; and on the 29th upon other members of both boards of the common council. On the 29th the board of aldermen, and on the 30th the board of assistants, by the votes of a majority of their respective members, passed the resolution, notwithstanding the injunction, which act is the one mentioned in the plaintiff's second point as "illegal and criminal." To prevent any misapprehension, let me state: the superior court and the court of common pleas of the city and county of New-York and their respective judges, have precisely the same equity jurisdiction, and the power and right to issue injunctions, that the supreme court of the state and its justices in this district possess. As regards the city and county of New-York, their equity powers and ours are concurrent. Therefore, although the adjudications of those courts are not authority binding upon this, yet they are always referred to with the greatest respect, and followed, except in cases where we are constrained to differ upon principle. I will now give some extracts from the opinion (furnished to us by the counsel for the plaintiffs) of Judge Duer, delivered in the injunction case, showing what acts the injunction was intended to prohibit, and the acts committed which, in the opinion of the court, constitute the contempt, and the extent of the power claimed by those judges over the legislative action of the common council

of the city of New-York. Judge Duer states "the injunction order is the same as though it referred to and recited the resolution, and by express words had forbidden the common council to reconsider and adopt it." Again; "I shall treat the resolution as an ordinance, or by-law, and its reconsideration and adoption as, properly, acts of legislation, in the fullest sense in which the term legislation can be justly applied to the acts of a corporate body." Again; "Every alderman who voted for the resolution, with the intent that it should take effect as a corporate act, had given his assent. Every one of them, therefore, who has thus assented—the conclusion is plain and irresistible—has done the very act that the order of the court commanded him not to do; and by so doing, has violated its mandate and contemned its authority." Again; "I add that, even upon the supposition that they were bound by the provisions of their charter to reconsider the resolution, they were equally bound by the mandate of this court to rescind and reject it when reconsidered, if the order of the court was in truth issued in the exercise of its proper jurisdiction."

These extracts show that the superior court claims the jurisdiction to control, by injunction, the legislative action of the common council, and to compel all its members, while in their legislative capacity, and acting upon a legislative matter, to vote according to the directions of a single judge, and against their own deliberate opinion; and that, should the members of the common council in such matter vote in opposition to the dictation of the judge, such act would be illegal and criminal, and consequently void. The judge, in his opinion, also states: "The injunction commanded the corporation and its members to desist absolutely from the performance of certain specific acts; and, if this command could under no circumstances be rightfully addressed by a court of equity to a municipal corporation, *the common council and its members, in the just maintenance of their own rights, were bound to disregard it.*"

The words which I have italicised, present the question which this court has under consideration, viz.: Was the injunction of Judge Campbell in truth issued in the exercise of his proper

Milhau v. Sharp.

jurisdiction? If it was not issued "in the exercise of proper jurisdiction," then, in the language of Judge Duer, "the common council and its members, in the just maintenance of their own rights, were bound to disregard it," and their voting in the affirmative was not "an illegal and criminal act, which could confer no right." This leads to two questions; 1. What kind of a corporation is that of the city of New-York? 2. What are its powers? The mayor, aldermen and commonalty of the city of New-York are a municipal corporation, created for governmental purposes, possessing, however, as incidental thereto, in many respects, the character of a private corporation. This corporation has two separate and distinct series of corporate powers, rights, duties and responsibilities: the one, that of a government, of which I will speak hereafter; the other, that of a private corporation, which I will now consider, because it is necessary for the purpose of intelligibly defining the line between its property, liabilities, duties and objects, as a private corporation, and its powers, franchises, rights, jurisdictions and immunities as a government. The charter of the city (*Kent's Notes and City Charter, p.* 14, § 2) grants, ratifies and confirms to the mayor, aldermen and commonalty of the city of New-York, "the city hall or state house, with the ground thereto belonging, two market houses, the bridge into the dock, the new burial place, and the aforementioned ferry, with these and every of their rights, members and appurtenances, together with all the profits, benefits and advantages which shall or may accrue and arise at all times hereafter, for dockage or wharfage within the said dock, with all and singular the rents, issues, profits, gains and advantages, which shall or may arise, grow or accrue, by the said city hall and state house, bridge, dock," &c. The same authority, (page 16, sec. 3,) grants to the mayor, aldermen and commonalty, &c. "all the vacant land within the city of New-York and on Manhattan island, extending to low water mark," &c. (p. 48,) "to lay out their grounds and build upon them," &c. The Montgomerie charter recites and re-affirms the grants of property before mentioned, and grants vacant lands on both sides of the East river, between high and low water mark, and power to

establish as many ferries as they please.  Section 37, page 142, renews these grants, and makes additions to them.  All these grants, the mayor, aldermen and commonalty hold as trustees, for the benefit of the community at large.  As regards this property, the corporation is a private corporation, trustees for the citizens; and, in relation to it, may be sued in the same manner as private corporations; and their agreements in relation to it, their sales and leases of it, may be governed and controlled by the courts, by the same process and in the same manner that our courts deal with and control corporations of banks, insurance companies, and village libraries.  Chief Justice Nelson, in the case of the *Mayor, &c. of the City of New-York* v. *Administrators of Joseph Britton,* says : " The charter of the city of New-York confers upon the defendants many powers and privileges that belong to them in common with private companies or individual citizens, which they hold and enjoy in the capacity of a private corporation.  Thus they are declared to be able, in law, and capable to sue and be sued, implead and be impleaded, &c. in all manner of actions, suits, complaints, pleas, causes, &c. in as full and ample a manner as any citizen, &c."  The charter also conferred upon them the ferries on both sides of the East river, and all others then or thereafter to be erected and established all round the island, &c.  These grants, and many others that might be enumerated, constitute a large mass of private rights and interests in various descriptions of property, &c. " held and enjoyed by the city in the same way, and in common with any citizen upon whom like property and franchises might have been conferred ;" and within the limits of the grant, the defendants may deal with the property, in their management and disposition of the same, in any way that would be lawful for an individual owner ; and any contracts or engagements entered into in the course of such management and disposition, would be as obligatory upon them as upon an individual."  In the case of *Bailey* v. *The Mayor, Aldermen and Commonalty of the City of New-York,* (2 *Denio,* 433,) the supreme court of this state held, "That the grant of the legislature, authorizing the city to furnish the city with water by means of the Croton aqueduct,

Milhau v. Sharp.

was the grant of a private franchise, made as well for the private emolument and advantage of the city, as for the public good; and that the defendants, *quoad hoc*, were to be regarded as a private company, and to be dealt with accordingly."

In the Berrian island case, tried in this court, in which Justice Edwards delivered the opinion of the court, sustaining the injunction against the corporation, and in the Washington market case, in which the opinion was delivered by Mr. Justice Roosevelt, sustaining the injunction, the corporation were held to be *quoad hoc* a private company, and were dealt with accordingly, because in both cases the subject matter of the controversy was the private property of the corporation. The mayor, aldermen and commonalty of the city of New-York possess another and very different and more important power—a governmental power. This power is conferred by the charter, and also by various statutes. They may pass laws for the government of the people, and enforce obedience to them by fines and penalties. Their control over the streets and highways, their right to do any thing in relation to the streets, or to order it to be done, or granting permission to others in relation to streets, is embraced in this governmental power. This political government power is limited, and subject to the control of the legislative power of the state ; but to the extent of the power delegated to them in their exercise of 'it, and the immense discretion that is conferred with it, they are as exempt from judicial interference, dictation and control, as is the state government itself; and for the same political reasons, to keep separate and distinct the three departments of government—legislative, executive and judicial—so that neither shall interfere with, dictate to, or control the other. This separation is necessary, that the people may, through the independence of these departments, be protected against a usurpation of arbitrary power by either. So long as these three departments act independently of each other, liberty to the citizen is a practical existing principle ; but the moment one of them absorbs the other, or as soon as the judiciary can compel the legislative body not to vote upon a question, or to vote in accordance with its dictation, by imprisoning those mem-

bers who refuse, this dictatorial power becomes the government; and if the citizen does not feel oppression, it is only because there is no immediate reason for its exercise. By the charter of the city, and by statutes of our state legislature, extensive and important governmental powers are given to the mayor, aldermen and commonalty of the city of New-York, in their capacity as a municipal corporation. In relation to the exercise of these powers, to the extent delegated, they are subject only to the legislative action of the state, altering, modifying or revoking them, and to the judicial tribunals of the state, acting only in the same manner that the judiciary can act against the officers of the state and against the laws of the state. If the legislature of the state is about to enact a law palpably unconstitutional, the judiciary cannot legally issue an injunction to prevent members voting for the law, or to compel them to vote against it.

After the bill has received all the forms to make it a law, and is attempted to be used as a law, the judiciary, by injunction, may, in a proper case, stay its application, upon the ground of its unconstitutionality. So, also, if the common council are about passing a law or ordinance that is either unconstitutional or beyond the power delegated to them by the charter or the laws of the state, the judiciary cannot interfere with the action of the members by injunction. But after an ordinance has received all the sanction that the common council can give to it, then the courts, either by injunction or by other proceedings, as may be required in the particular case, may declare the ordinance to be void by reason of the want of authority to enact it. If, however, the legislature of the state have the constitutional power upon the subject, and the mayor, aldermen and commonalty have the charter power to pass the law or ordinance, the entire discretion as to the details of the law or ordinance is vested in the legislature or in the common council, and no judge or judicial tribunal has a right to interfere because they may be of opinion that such discretion was unsound, indiscreet, erroneous, or even corrupt. If courts were permitted to interfere with the discretion of the law-making power, then it would be at the discretion of the judges, and not of the legislators that made the

laws; for no law could exist, unless it squared precisely with judicial ideas of what was discreet and proper. It will be perceived, upon an examination of the charter, and of the statutes in relation to them, that the streets are under the control of the mayor, aldermen and commonalty, as a government, (unlike the ferries, the city hall, the lands, piers, docks and slips, &c. which belong to them as a private corporation.) The streets are expressly declared to be " for the use and service of the said mayor, aldermen and commonalty of the said city, and of the inhabitants of Manhattan island aforesaid, and travelers there." (*Kent's Com. ch.* 14, 15.) Therefore, giving the corporation the power to lay out new streets, and to alter and repair streets, makes them the judges of what is necessary and convenient for all inhabitants and travelers there. Chancellor Kent, in his notes upon the charter, page 235, note 31, states: " The 16th section gives the common council power to establish, direct, lay out, alter, repair and amend streets, lanes, alleys, highways, water courses and bridges, throughout the city and island. This is a grant of a public nature, without any private interest, or property, of revenue connected with it, and it has always continued with the common council, under free and active exercise, subject, nevertheless, at all times, to legislative interference and direction."

Chief Justice Nelson, in his opinion in Britton's case, before referred to, after specifying a great number of the rights and privileges held by the corporation, as a private corporation, goes on to say : " These rights and privileges thus granted are altogether distinct and different from those with which the defendants are invested under the charter as a municipal body. The latter class comprises a large body of political powers, granted solely for public objects and purposes, with which the private interest and estate of the defendants, strictly speaking, have no concern. These powers are conferred for the benefit of the city as a community, and the end sought to be attained, its good government. On looking into the charter, it will be found to embrace an extensive grant of political power, legislative, executive and judicial, which, so far as granted, represents

these great departments of the state government, and which are lodged with the defendants in their capacity as a municipal corporation. The legislative power is conferred upon the common council. That body is empowered 'to frame, constitute, ordain, make and establish, from time to time, all such laws, statutes, rights, ordinances and constitutions, which to them, or the greater part of them, shall seem to be good, useful or necessary for the good rule and government of the body corporate.' Power is also given to inflict penalties for the violation of any ordinance or by-laws passed by this body."

The matter which was being considered by Justice Nelson was a contract which a previous common council had made, and which a new common council had repealed. The chief justice continued : "Now, it certainly requires no argument to prove that the powers of the defendants brought into exercise in forming and entering into the covenant and stipulation in question, providing for cleaning the streets, public wharfs, and piers of the city, and sweeping the same, belonged to, and were part and parcel of its legislative and executive authority, wholly independent and disconnected from the particular class or body of powers having reference to their interest and affairs as a private company."

It is therefore clear that the common council were acting as a political body, upon a subject purely governmental, where their own discretion was paramount, in the exercise of which, no judicial power had the legal right to interfere, nor any power except the legislature of the state, and that alone by an act repealing the power conferred upon the common council, or repealing or altering the particular resolution or ordinance. My conclusion, therefore, is, that no court could legally interfere with the action of the members of the common council in casting their votes; that Judge Campbell had no jurisdiction to grant the injunction ; that the members of the common council were not bound to obey it ; and that their disobedience of it forms no ground for the interference of this court. Having thus disposed of this part of the case, the question then recurs, can this court interfere with the grantees in the execution of

Milhau *v.* Sharp.

this grant? The solution of that question appears to me to be involved in what I have already stated; and my opinion is, that the form of the grant, and its terms and conditions, were within the discretion of the common council. The decisions are many and uniform that the corporation has a right, as a government, to lay rails in the streets of the city. This being established, one would suppose there could be no question that, as a legislative body, they have full power to exercise their own discretion in performing an act admitted to be within their power. My brethren think that they can enter into the question, whether the power has been wisely exercised or not. I think that it is not for us to decide; that the law has placed the decision of that whole matter with the common council, and not with the court. There may be many considerations determining the decision of the common council, that are not proper subjects of inquiry here. That, I think, is the answer to the whole argument for this injunction. It is said that the great difference between the amount received from these grantees, and the amount offered by others, is such as to give the courts a right to interfere. I do not think so. I do not think that that difference, whether great or little, gives us jurisdiction. But I cannot omit saying that the streets, not being private property of the corporation, the corporation could not receive money for the use of them. They could make no contract in relation to them that could not be repealed by themselves or their successors; and as the streets are public property, they could receive no sum for their use not authorized by acts of the legislature. By the charter and acts of the legislature, the corporation are authorized to license hackney coaches and other vehicles carrying persons for hire, and to charge for the license of each such vehicle, not exceeding ——. This is a governmental power, to enable the authorities to have control over those to whom citizens intrust their persons and property. The corporation have no power or authority to receive more than the legislature of the state has by law authorized. In granting licenses to omnibuses, the mayor acts as an executive officer of the city. Should he, in the exercise of his discretion as such executive,

determine, (which he certainly has the right to do, and which right has been frequently exercised,) to license but one line of omnibuses for one street, and should charge that line the maximum price for each vehicle, and another applicant should then offer three times the amount for a license to him, with an obligation to put on as many omnibuses as the person to whom the mayor was about giving the license, would it be the duty of the mayor to accept that offer, and could the courts compel him to do so? It does not require much argument to show the absurdity of such a position. I cannot view this transaction of the common council in any other light than I would view the act of the mayor in respect to such omnibuses. I might illustrate this by a variety of other examples, but I have said enough to explain the positions upon which I think this cause rests.

My conclusions upon the whole matter, are : first, that the injunction out of the superior court was without jurisdiction, and void; second, that the common council has ample authority to authorize the railway in question; and third, that this court cannot supervise and control the discretion of the common council in respect to the terms and conditions on which, and the persons in whose favor, that authority should be exercised. The injunction should therefore be refused.

Injunction granted according to the prayer of the complaint.

[New-York General Term, April 4, 1853, *Edwards*, *S. B. Strong* and *Morris*, Justices.]