SARAH P. STUART AND ELIZABETH K. DODGE

*vs.*

CHARLES E. FOX AND EDWARD E. FOX.

SARAH P. STUART AND ELIZABETH K. DODGE *vs.* JESSIE C. MINOTT.

SARAH P. STUART AND ELIZABETH K. DODGE

*vs.*

HARRY M. SHWARTZ AND JESSE M. ROSENBERG.

Cumberland. Opinion November 29, 1930.

408

*Frank H. Purinton,* for demandants.
*Verrill, Hale, Booth & Ives,* for C. E. Fox et al.
*George H. Allen,* for Jessie C. Minott.
*Brooks Whitehouse,* for Harry M. Shwartz and Jesse M. Rosenberg.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, THAXTER, JJ.

THAXTER, J. These three cases, which are writs of entry, involve the same facts, and are reported to this court for final determination on so much of the evidence as is legally admissible. From this evidence the following facts appear:

In 1850 James Deering was the owner of a large tract of land in what is now a growing and populous part of the City of Portland. In that year the York and Cumberland Rail Road Company, which subsequently became the Portland & Rochester Railroad Company, acquired under the terms of its charter by condemnation a right of way six rods wide through the Deering land. One rod of this was subsequently reconveyed so that the width of the way as finally used by the railroad was eighty-two and one-half feet. In 1886 the heirs of James Deering, then owning the land on each side of this right of way, conveyed to Carrie A. Nutter a piece of land on the westerly side of it described as follows:

"A certain lot of land situated on the Northerly side of Noyes Street in said Deering and described as follows viz., beginning at the corner formed by the intersection of the Northerly side line of said Noyes Street with the Northerly side line of Longfellow Street; thence Westerly by said Longfellow Street sixty (60) feet to a point; thence Northerly on a line at right angles to said Longfellow Street two hundred and seventeen (217) feet and .95 of a foot more or less to the location of the Portland and Rochester Railroad; thence Southeasterly by said location two hundred and ten (210) feet more or less to said Noyes Street; thence Westerly by

said Noyes street, ninety eight (98) feet more or less to the corner begun at. For a more particular description reference may be had to a plan in the possession of the said Grantors."

This lot of land, through various conveyances and devises, and through descent, is now owned by the plaintiffs. The area on the other side of the railroad location opposite this lot between the railroad and Forest Avenue, being a piece varying in width from one hundred and thirty-nine to one hundred and fifty-four feet, was held by the Deering heirs until 1894, when it was conveyed to Arthur E. Marks. The northerly and westerly bounds of this land were described in the deed as follows:

"thence westerly on a line parallel with Noyes Street one hundred and thirty-nine (139) feet more or less, to the location of the Portland and Rochester Railroad Company; thence Southerly by said location two hundred and sixty (260) feet more or less to said Noyes Street."

It will be seen from these two deeds therefore that the Deering heirs, owning the fee in the railroad right of way and in the land on both sides of it, conveyed the area first on the westerly side, and eight years later that on·the easterly side, describing both of such lots as running "to" and "by" the railroad location.

In 1911 the Portland & Rochester Railroad abandoned its right of way, and in 1922 the Deering heirs by three warranty deeds conveyed to the predecessors in title of the defendants in these actions the area comprising such location between the lots previously conveyed to Carrie A. Nutter and to Arthur E. Marks.

These suits are brought to recover the westerly half of such railroad location in so far as it abutted the property now owned by the plaintiffs, whose claim is that the deed to Carrie A. Nutter conveyed to her the fee to the center of the railroad property and that on the abandonment of this they became possessed of this land free from the encumbrance of the railroad right of way. The defendants claim through the deed from the Deering heirs, their contention being that title to the fee in this strip was retained by the grantors when the land on each side of it was conveyed.

The question here presented has never come before the courts of

this state, although there are conflicting decisions in other juris-
dictions. It is important not only to the parties in this case who are
contesting the title to real estate, on which have been built perma-
nent structures of substantial value, but also to others similarly
situated. It is also possible to foresee the abandonment of other
railroads in this state, and extensive litigation to determine the
title to their rights of way, if this question is not definitely settled
in this jurisdiction.

The contention of counsel for the plaintiffs is that a railroad
right of way is a highway and that the same rule which applies in
the case of land bounded on a highway should apply to that ad-
joining a railroad. This well established principle is that a con-
veyance of land bounded on a highway, the fee of which is owned by
the grantor, carries title to the center of it unless a contrary intent
appears. *Oxton* v. *Groves*, 68 Me., 371; *Low* v. *Tibbetts*, 72 Me.,
92; 4 R. C. L., 78. A glance at the reasons for this rule will per-
haps indicate how far it is applicable to land abutting on a railroad.

The procedure for the location of highways is now largely gov-
erned by statute. In early times they were ordinarily created by a
dedication express or implied by the owner of the land through
which they ran. *British Museum* v. *Finnis*, 5 C. & P., 460. How-
ever created, the right given was ordinarily an easement. The pub-
lic had the right of passage, but title to the soil was retained by
the original owner. *Peck* v. *Smith*, 1 Conn., 103; *Webber* v.
*Eastern Railroad Company*, 2 Met., 147, 151; *Burr* v. *Stevens*, 90
Me., 500. It is true that the grant of this easement carried with it
all the incidents necessary to make the enjoyment of the public
right effective, not only with reference to the amount and methods
of travel in vogue at the time of the grant, but with respect to
such as an advancing civilization might indicate were reasonable
and proper. *Milhau* v. *Sharp*, 15 Barb., 193, 210; *Burr* v. *Stevens*,
supra. The ownership of the fee in the highway in early times, when
the means of travel were primitive, was of distinct benefit to the
owner of the adjoining land, and today even with the enlargement
of the public right, this claim to the freehold is of advantage to the
abutting property holder. Thus the proprietor of the soil in the
highway had the right to the grass along its untravelled border,

and he could maintain trespass against one who permitted his cattle to graze there, *Woodruff* v. *Neal*, 28 Conn., 164; the right to make a reasonable use of it for the unloading and temporary storage of fuel for the use of his house, *Commonwealth* v. *Passmore*, 1 Serg. & Rawle, 217, 219; the right to the minerals under it, *Chester* v. *Alker*, 1 Burr., 133, 143; the right to sink drains under it, *Perley* v. *Chandler*, 6 Mass., 453; the right to build vaults under the street for storage or other uses connected with his buildings, *Allen* v. *City of Boston*, 159 Mass., 324; the right to plant ornamental or shade trees, *Wellman* v. *Dickey*, 78 Me., 29. Other advantages associated with the enjoyment of the abutting property by reason of the ownership of the fee in the highway could be enumerated.

Courts have attempted to justify the presumption that title to land bounded on a highway extends to the center of the way on the theory that the grantor could not have intended to retain the ownership in a long narrow strip of land of no apparent benefit to himself. This is undoubtedly a consideration which should be given weight, but looking at the principle in its early origin, it seems to be of even greater moment that the grantor should not be presumed to retain for himself that which is of distinct benefit to his grantee in connection with the proper use and enjoyment of the estate conveyed.

An almost perfect analogy with the rule as to highways is that governing the boundaries of land on non-navigable streams. The title to land so bounded extends to the thread of the stream unless a contrary intent appears. *Lincoln* v. *Wilder*, 29 Me., 169; *Bradford* v. *Cressey*, 45 Me., 9; *Wilson* v. *Harrisburg*, 107 Me., 207. This was the rule in England as far back as the time of Lord Hale and was brought by the colonists to New England as a part of the common law. The riparian proprietor owns the bed of the stream and all but the public right of passage. *Pearson* v. *Rolfe*, 76 Me., 380. As he could take herbage from the highway for his cattle, so he may take water from the stream, *Blanchard* v. *Baker*, 8 Me., 253, 266; as he could use the land under the highway so long as the public right of passage was not affected, so may he use the bed of the river. *Carleton* v. *Cleveland*, 112 Me., 310. He is entitled to

the ice that forms in winter, and to the rocks and stones in the stream, and he may use its momentum for power. *Pearson* v. *Rolfe*, supra. These rights, of such immeasurable benefit to the proprietor of the shore, are of little advantage disconnected with the ownership of it. Hence we have the same presumption as in the case of highways.

A similar situation exists in the case of the title to tidewater flats between high and low water mark. Originally these belonged to the crown, but under the provisions of the Colonial Ordinance of Massachusetts, 1641-47, it was declared "that in all creeks, coves, and other places, about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above one hundred rods, and not more wheresoever it ebbs further." As in the case of the soil comprising the highway, and of the land forming the bed of the stream, the ownership of the flats was of paramount importance to the proprietor of the uplands above the sea, and in accordance with the rule followed in the other two instances, a conveyance of the uplands is construed to include such flats unless a contrary intent appears. *Whitmore* v. *Brown*, 100 Me., 410.

In all three of these cases, the principles of which have been a part of the common law, this court has endeavored merely to give effect to the real intention of the parties. It has gone no farther than that, and has sought to establish no arbitrary rule on supposed grounds of public policy. It is merely adopting a general principle, which is based on the well-known rule of construction that the circumstances and situation of the parties shall be considered in determining the meaning of the language used by them.

In *Bradford* v. *Cressey*, supra, the court, after showing that the rule with respect to streams and highways is the same and in holding that a bound by the west bank of a stream excludes the stream, says at page 13: "The intention of the party is always to be sought in the interpretation of deeds, as in other written instruments. If the language leaves that intention at all doubtful, the instrument should be examined and construed, when practicable, by the light of the circumstances which surrounded and were connected with the execution of the instrument."

In *McLellan* v. *McFadden,* supra, Chief Justice Savage, in deciding that the flats were excluded from a conveyance, said at pages 246-7 : "In construing the grant we are to give effect, if possible, to the intention of the parties, so far as it can be ascertained in accordance with legal canons of interpretation. We are to give effect to the expressed, rather than the surmised, intent. We are to consider all the words of the grant in the light of the circumstances and conditions attending the transaction. But we must consider and construe the grant according to settled rules of construction. They are rules of property. And the security of real estate titles depends upon a strict adherence to these rules of construction."

In *Crocker* v. *Cotting,* 166 Mass., 183, 185, Judge Holmes says : "The rule by which the mention of a way as a boundary in a conveyance of land is presumed to mean the middle of the way, if the way belongs to the grantor, is not an absolute rule of law irrespective of manifest intention, like the rule in Shelley's case, but is merely a principle of interpretation adopted for the purpose of finding out the true meaning of the words used."

In *Vanderbilt University* v. *Williams,* 152 Tenn., 664, the court found sufficient evidence of intention to exclude the highway. One important factor in the case was that the distances, which were short and given with extreme accuracy, carried only to the exterior lines of the way. In discussing the ordinary presumption that arises with respect to land bounded on a highway the Court said at page 669 : "But over all runs the rule requiring effect to be given to the intent of the parties."

The following are to the same effect as the above cases : *Winslow* v. *Allen,* 48 Me., 249 ; *Hamlin* v. *Pairpoint Manufacturing Co.,* 141 Mass., 51 ; *Hamlin* v. *Attorney General,* 195 Mass., 309 ; *The Boston Five Cent Savings Bank* v. *Massachusetts General Hospital et als,* 255 Mass., 583 ; *In re Parkway, Woolf* v. *Pierce,* 209 N. Y., 344 ; *Warden* v. *South Pasadena Realty Co.,* 178 Cal., 440 ; *Watson* v. *New York,* 73 N. Y. S., 1027, affirmed 175 N. Y., 475 ; *Wood* v. *Culhane* (Mass., 1929), 164 N. E., 622 ; *Hughes* v. *Providence & Worcester Railroad Co.,* 2 R. I., 508 ; *Buck* v. *Squiers,* 22 Vt., 484.

Some courts have leaned very far to the view that public policy is the controlling consideration, and that the language of a deed will be strained to give effect to a construction, which will not leave the fee of a narrow strip of land in the possession of a grantor, which may be of no real value to him and may be a cause of litigation in future years, when his heirs may be scattered and difficult to find. *Paul* v. *Carver*, 26 Pa., 223 ; *Cox* v. *Freedley*, 33 Pa., 124.

The language of Justice Taft, while a Circuit Judge, illustrates this point of view. In the case of *Paine* v. *Consumers Forwarding & Storage Co.*, 71 Fed., 626, he said at page 632 : "The evils resulting from the retention in remote dedicators of the fee in gores and strips, which for many years are valueless because of the public easement in them, and which then become valuable by reason of an abandonment of the public use, have led courts to strained constructions to include the fee of such gores and strips in deeds of the abutting lots. And modern decisions are even more radical in this regard than the older cases." That case was, however, merely one which involved the application of the ordinary presumption recognized in Maine and in all other jurisdictions that a conveyance of land bounded on a highway includes the fee to the center of the way, and the language of the court should not be considered as applying to any other state of facts.

The Pennsylvania cases, though they hold, contrary to the general weight of authority, that land bounded specifically by the side line of a street extends to the center, base their decisions on what they claim to be the real intention of the parties. The court lays more stress on the surrounding circumstances than on the language used in determining what that intention is.

The majority and minority opinions in the case of *Buck* v. *Squiers*, supra, show very clearly the divergent views of those who base this boundary rule on the intention of the parties and of those who find its justification in reasons of public policy. In this case a conveyance bounded land by the easterly side of a road and the northerly side of a stream and the court held that the exterior lines marked the boundaries. The majority opinion held that it was the intention of the parties that governed, with the burden on the

party who sought to show that the ordinary presumption did not apply, which extended such boundaries to the center lines. Judge Redfield in an able dissenting opinion contended that the primary consideration was public policy. He said at pages 494-495: "The rule, to be of any practical utility, must be pushed somewhat to the extreme of ordinary rules of construction, so as to apply to all cases when there is not a clearly expressed intention in the deed to limit the conveyance short of the middle of the stream, or way. If it is only to be applied, like the ordinary rules of construction as to boundary, so as to reach, as far as may be, the clearly formed idea in the mind of the grantor at the time of executing the deed, it will ordinarily be of no utility, as a rule of expediency, or policy." The doctrine of the majority opinion has, however, been generally followed.

If the rule is founded on considerations of expediency to prevent title to small remnants of land being left in remote grantors, there would seem to be no reason why it should not apply as well to land bounded on private ways as on public ones. Yet Maine has not so extended its application. *Bangor House* v. *Brown*, 33 Me., 309; *Palmer* v. *Dougherty*, 33 Me., 502; *Ames* v. *Hilton*, 70 Me., 36; *Winslow* v. *Reed*, 89 Me., 67; *Coleman* v. *Lord*, 96 Me., 192; *Young* v. *Braman*, 105 Me., 494. These cases are an indication of the hesitancy of this court to establish an arbitrary rule of construction not founded on a real intent. This rule has been followed in Connecticut. *Seery* v. *City of Waterbury*, 82 Conn., 567. Chief Justice Baldwin in this case said at page 571: "There is here no statute or judicial precedent which governs, nor any general custom of which we can take judicial notice. The question is one, also, not settled by the common law. It is therefore our duty to answer it by the choice of the rule which, in our judgment, is best calculated to do justice in cases of this character. This we have done. We adopt that which does not raise, in case of a boundary on a private way, the presumption which obtains in case of one on a highway. By that rule, because it is (or by our adoption of it becomes for Connecticut) the rule of justice, it may fairly be assumed *prima facie* that the parties to such a transaction intended to be governed, by force of the words which they employed."

Counsel for the plaintiffs in the instant case contends that this court should extend the presumption recognized generally in the case of land bounded on a highway to land bounded as here on a railroad location. He argues that such railroad is a highway and that in the charter of this company it is specifically provided that the land taken by the railroad for its right of way "shall be held as lands taken and appropriated for public highways." He cites some cases which support his view.

In *Center Bridge Co.* v. *Wheeler & Howes Co.*, 86 Conn., 585, the court holds squarely that a railway right of way is analogous in all respects to a public highway in that it has permanence and is used by the public in distinction from the use made of a private way; and the court therefore concludes that exactly the same presumption applies as in the case of the highway.

To the same effect are the following: *Rice* v. *Clear Spring Coal Company*, 186 Pa., St. 49; *Roxana Petroleum Corporation* v. *Sutter*, (C. C. A. 8th Cir.), 28 Fed. 2ds, 159; *Roxana Petroleum Corporation* v. *Jarvis*, 127 Kan., 365.

There are dicta in two Vermont cases which likewise support the plaintiff's contention. *Maynard* v. *Weeks*, 41 Vt., 617; *Church* v. *Stiles*, 59 Vt., 642.

Counsel cites three decisions from South Carolina, *Wright* v. *Willoughby*, 79 S. C., 438; *Foster* v. *Foster*, 81 S. C., 307; *Boney* v. *Cornwell*, 117 S. C., 426. In the first two of these cases the court recognizes a distinction between the case where land is bounded by a railroad and that where it is bounded by land occupied as a railroad, and holds that in the former instance the right of way to the center is included, in the latter case that is not. In *Foster* v. *Foster*, supra, the Court says at page 312: "if it had been the intention to reserve the land occupied by the railroad, the boundary should, and doubtless would, have been given as the land so occupied. When it was in fact given as the railroad itself, the conveyance covered all the land, including that occupied as a right of way, to the center of the railroad track." This distinction seems to be in accord with the language used by Judge Gray in *Boston* v. *Richardson*, 13 Allen, 146, at page 154. It appears to have been overlooked in the third case of *Boney* v. *Cornwell*.

Numerous other authorities cited by counsel for the plaintiffs do not seem to be in point.

When we consider the real origin of the highway rule, that it had its foundation in the early customs of the people which gave to the abutting property owner, having title to the fee in the highway, certain rights in the highway of real advantage to him in the daily use of his adjoining land, we can see very little analogy between his situation and that of the owner of land bordering on a railroad right of way. The land owner beside the railroad has no use whatsoever of the railroad way. In fact he is absolutely excluded from it. The use of it by the railroad is altogether inconsistent with the idea that it could in any way be of advantage to his adjoining land. It is quite true that a railroad way is often referred to as a public highway. This designation has reference to the fact that it is open to the public for travel under the restrictions imposed by law; but it has never been considered that, for this reason, it has the other incidents of a public highway. This court has very clearly pointed out this distinction in *Hayden* v. *Skillings*, 78 Me., 413, 416, when it said: "It follows that the easement in lands taken for the purpose of a railroad is obviously vastly different from that in lands appropriated to the various kinds of other public ways." The court then indicates clearly what these differences are, one of which is that the railroad must have the exclusive occupation and control of its property without any interference by the adjoining land owner.

Nor does the fact that the Portland & Rochester Railroad under its charter held its right of way "as lands taken and appropriated for public highways" in any way alter the case. The legislature by this language did not mean to imply that its right of way was in all respects similar to a highway, but merely that it held it as an easement devoted to the public use in distinction from an ownership in fee.

The only analogy which we can see between the railroad right of way and the highway is that in both cases the grantor, if he retains the fee in such a way, may own a long narrow strip of land which may not be of any great value to him. To hold that because of that fact he must be presumed to have conveyed the fee in that strip

with a deed of the adjoining property is an extension of the ordinary rules of construction which in our opinion will lead to more confusion than the evil which it is sought to remedy. Such a doctrine this court refused to adopt in the case of land bounded on a private way. In our opinion it loses sight of the most important consideration of all — that the presumption in the case of bounds on highways and streams is based, not so much on the fact that the grantor does not intend to retain that which is of no apparent benefit to himself, but rather on the assumption that he does not intend to withhold that which has a real and present advantage to his grantee. The views which we have here expressed appear to be sustained by courts of high authority.

In *Thompson* v. *Hickman*, 1907, 1 Ch., 550, 556, is found the following statement of the court: "I am, however, asked to hold that, where land on either side of a railway line is granted, the minerals underlying the railway line pass, unless they have been previously vested in the railway company, and I am asked so to hold on the analogy of the presumption which obtains in the case of land bounded by highways. I cannot come to the conclusion that I should be right in acting upon any such presumption, which, so far as I know, is wholly unknown to the law at the present time. I think the very different circumstances under which railways came into existence and those in which watercourses and highways came into existence are sufficient to shew that the presumption does not apply to the case of a railway."

In *Couch* v. *Texas Pacific Railway Co.*, 99 Texas, 464, 467, the Supreme Court of Texas said: "The right of way of a railroad is not a public highway in the sense of a public road or street, and the rule of construction which applies to a deed for land bounded by a public highway does not apply in this case so as to make the deed convey land not included in its terms."

Not only can we see no reason which compels us, because of analogy, to extend the highway rule to railroad rights of way, but there are cogent reasons why this should not be done. The instant case is a striking example that considerations of public policy cut both ways. In reliance on the usual and ordinary rules of construction, the defendants in this case accepted deeds from the sup-

posed owners of this railroad right of way. They have built permanent structures on it of large value; and the railroad location has become incorporated in an important business center of the city of Portland. To disturb land titles there over a large area, to give to property owners land which for many years they never thought that they owned, and to take it from those who had every reason to suppose it was theirs, is a result which only compelling reasons of public policy can justify. These we do not find. The deed to this adjoining property, bounding it on the railroad location, was given in 1886. Except for the dicta in the two Vermont cases previously noted, no case had to that time intimated that land so bounded would extend beyond the exterior lines of that way. The parties to that deed presumably knew the rule governing boundaries on highways, streams and tidewater, and that Maine had not extended the presumptions there applied to the case of boundaries on private ways. They were justified in assuming that the usual rules would apply to the interpretation of their deed. Moreover, if there had been any change in the law, which we do not hold, the deed should be construed in the light of the law existing at the time when it was made. *Brown* v. *Peabody*, 228 Mass., 52; *DeBaun* v. *Pardee*, 139 N. Y. S., 1077. In our opinion the safe rule, which in the long run will do justice, is to rely on the language used by the parties interpreted in the light of established rules. So construed, what do the words mean used by the grantors in the deed to Carrie A. Nutter?

Plaintiffs' counsel contends that the words "railroad location" designate a monument as the boundary, such as a tree, a ditch, a stake and stones, or a wall, and that the lines as in the case of such other monuments extend to the center of it. This argument presupposes as a fact the very thing that we are here attempting to decide — whether the parties so intended to designate it. Such intention, as we have stated, is not to be presumed. The fact that the distances given by the grantors in their deed are set out with great particularity and extend the bounds to the side lines of the railroad location is a consideration of great importance. The westerly bound of the lot conveyed in this deed is described as follows: "Thence northerly on a line at right angles to said Longfellow

street two hundred and seventeen (217) feet and .95 of a foot more or less to the location of the Portland and Rochester Railroad." This measurement given to a fraction of an inch carries accurately to the side line of the railroad. The use of the words "more or less" is of no particular consequence when we consider that the plaintiffs' contention would extend this line more than forty feet farther. Moreover, as this course does not approach the railroad at a right angle, the direction from the point where it touches the railroad property would have to be materially changed to include the property claimed by the plaintiffs. Furthermore, this court has held that the words "to," "from" and "by" are words of exclusion. *Bradley* v. *Rice*, 13 Me., 198, 201. The language of the parties would seem clearly to exclude the right of way from the conveyance. If, however, anything more were needed, this conclusion is fortified by a consideration of the surrounding circumstances. The grantors kept the title to the land on the other side of the railroad for eight years after giving the deed to Nutter. This land was a comparatively narrow strip between Forest Avenue and the railroad. If the ownership of the fee in the right of way was of any value, it was worth more to the grantors in connection with land retained by them than to anyone else.

It is our opinion that the language used by the parties clearly excluded the railroad right of way. To hold otherwise would do violence to accepted rules for the interpretation of deeds. The entry must therefore be in each case

*Judgment for the defendants.*